United States Court of Appeals,

Fifth Circuit.

No. 91-4702.

Monique Lavette LAMPKIN, et al., Plaintiffs-Appellees,

v.

CITY OF NACOGDOCHES, et al., Defendants,

Jim Vanover, Police Officer, and Keith Shotwell, Police Officer, Defendants-Appellants.

Nov. 18, 1993.

Appeal from the United States District Court for the Eastern District of Texas.

Before JONES and WIENER, Circuit Judges, and LITTLE[1], District Judge.

PER CURIAM:

This is an appeal from a denial of qualified immunity to two police officers of the City of Nacogdoches, Texas.[2] The officers detained appellees Monique Lampkin and Richard Daniels for a period ranging somewhere from 12 to 30 minutes while they investigated whether Lampkin and Daniels might be connected with a threatened drive-by shooting. Lampkin contends that the officers smashed her VCR, and Daniels also contends that they hit his head on the car causing a lump and severe headaches. Questions of qualified immunity are presented at two levels: whether the officers' apprehension and detention of appellees was justified as an arrest or an investigatory stop; and whether the alleged personal and property injuries represented excessive force under the circumstances. As the officers did not clearly seek qualified immunity concerning the damage to the VCR or excessive force allegedly used on Daniels, we do not comment on those claims. We do hold that there are material fact issues in dispute concerning the basis for the officers' actions. Those issues must be resolved so that it can be determined whether the officers effected a constitutionally

---

[1]District Judge of the Western District of Louisiana, sitting by designation.

[2]In this interlocutory appeal from the denial of qualified immunity, we are not called upon to determine appellees' state law causes of action against appellants nor to rule on their claims against the City of Nacogdoches, nor to consider the official capacity claims against appellants, which are tantamount to claims against their employer the city.

sound investigatory stop or arrest of appellees and, if not, whether they were shielded by qualified immunity.  We have held that "if disputed factual issues material to summary judgment are present, the district court's denial of summary judgment on the basis of immunity is not appealable." *Feagley v. Waddill,* 868 F.2d 1437 (5th Cir.1989);  *see also, Johnson v. Odom,* 910 F.2d 1273, 1277 (5th Cir.1990).  We therefore have no jurisdiction over the appeal and dismiss.

I.

BACKGROUND

On the evening of July 4, 1990, Plaintiffs-Appellees Lampkin and Daniels, residents of Nacogdoches, Texas, drove a few blocks from their home to visit Lampkin's mother, who also lived in Nacogdoches.[3]  When the visit ended—approximately at midnight—Lampkin and Daniels drove home in their 1978 white Chevrolet Nova, which had a black vinyl top and gold trim.  The drive was short, as the home in which Lampkin and Daniels cohabited was located only a few blocks from Lampkin's mother's home.  That Daniels and Lampkin had not committed any crime on or before July 5, 1990, for which they would be subject to arrest, is undisputed.

While Lampkin and Daniels were driving back to their home, two Nacogdoches police officers, Jim Vanover and Mark Lamonte, each driving alone in a separate police car, began to follow them.  When Daniels and Lampkin pulled into the driveway of their home and parked, the two police officers pulled their squad cars up to the entrance of the driveway from opposite directions, quickly exited, shielded themselves with their respective vehicles, and pointed their service revolvers at Daniels and Lampkin.  The officers ordered the two to exit their car and proceed to the back of that vehicle with their hands raised.  Within a matter of moments, other Nacogdoches police officers, including Officer Keith Shotwell, arrived on the scene.  What transpired next is disputed.

The affidavits and pleadings submitted by Daniels and Lampkin state that, "for no reason," they were frisked, handcuffed, and placed in the back seats of separate police cars.  Meanwhile, their car was searched by Officers Vanover and Shotwell.  According to Lampkin and Daniels' affidavits,

---

[3]Because we are reviewing the district court's ruling on a motion for summary judgment, we have conducted a plenary review of the record.  *See Sims v. Monumental General Insurance Co.,* 960 F.2d 478, 479 (5th Cir.1992).

"we remained handcuffed and under arrest for fifteen to thirty minutes." During the course of the encounter, Vanover and Shotwell "tore up [Ms. Lampkin's] VCR and slammed Mr. Daniel's head against the car with great force, causing Mr. Daniels significant injury, including a lump on his head, and [Daniels] has complained of bad headaches." Lampkin and Daniels also stated in their affidavits that "[i]t seemed to us like the whole police force was at our house waiving guns at us. They would not even let us check the kids." In their joint complaint, Lampkin and Daniels alleged that Daniels suffered "extreme physical pain, injuries to [his] head, temporary disability, extreme mental pain and anguish, severe emotional distress, humiliation, and embarrassment." Ultimately, the police released Lampkin and Daniels at the site of that incident.

Officers Vanover and Shotwell's story—as recounted in their pleadings, affidavits, and deposition testimony, as well as in affidavits offered by other police officers—is considerably different. According to affidavits of two Lufkin, Texas[4] police officers, on July 1, 1990, Scott Hamilton, a black youth, was fatally shot during a gang-related fight in Lufkin. The Lufkin police there became concerned that Hamilton's relatives or fellow gang members would avenge the shooting. One Lufkin officer, Detective Rich Harrison, was informed by unnamed relatives of Scott Hamilton that "black youths" from Lufkin were planning to drive to Nacogdoches to commit a drive-by shooting of one or more black youths responsible for shooting Scott Hamilton. No information was provided about when the shooting was supposed to occur, where in Nacogdoches it would occur, or who the victims would be. Harrison also heard that the "youths" would possibly be driving a red Chevrolet Camaro, a silver Ford Ltd, or a blue and white 1978 Chevrolet Nova. Harrison passed this information on to the Nacogdoches Police Department, which in turn relayed it to all of its officers.

Scott Hamilton died during the afternoon of July 3, 1990. After Hamilton's death, his uncle informed Lufkin police that no retaliation would occur, but shortly thereafter Lufkin Police Lieutenant Alton Lenderman was informed by another Lufkin police officer[5] that the decedent's brother, Brian Hamilton, "was on his way to Nacogdoches and that he had left fifteen minutes" earlier. Lenderman's

---

[4]Lufkin is located approximately 20 miles from Nacogdoches.

[5]That officer was identified only as "Officer Parrott."

affidavit does not identify the source of Officer Parrott's information about Brian Hamilton. Hamilton was reported to be driving a blue and white 1978 Nova and carrying at least one handgun and a shotgun. Lieutenant Lenderman immediately relayed this information, including the name of the suspect, to the Nacogdoches Police Department.

The affidavits and deposition testimony of Officers Vanover and Shotwell generally comport with the affidavits of the two Lufkin police officers, although they differ in certain significant respects. Vanover and Shotwell did not claim that they were told that an individual named Brian Hamilton was coming to Nacogdoches during the afternoon of July 3, 1990; neither did they claim that they were earlier informed that black "youths" were planning to commit a drive-by shooting. Rather, they simply stated that they were informed that black "males" were planning to perpetrate the crime. Vanover and Shotwell also claimed that they were specifically informed by Lufkin police that the drive-by shooting was scheduled to occur "late" July 4, 1990, or "early" July 5, 1990. The affidavits provided by the Lufkin police officers, however, did not state that they had ever specified when the shooting was supposed to occur, other than reporting that Brian Hamilton allegedly was driving to Nacogdoches on the afternoon of July 3, 1990. Vano ver also stated in his affidavit that he was informed by Lufkin police that the suspects would be carrying "several semi-automatic pistols and a semi-automatic rifle". The affidavit from Lufkin Lieutenant Lenderman stated that Brian Hamilton was armed with "at least a handgun and a shotgun."

Officer Vanover's affidavit and deposition testimony recount that he was driving in his patrol car at 11:08 p.m. on July 4, 1990, when he noticed a car that he believed was a blue and white Nova which possibly could have been a 1978 model.[6] Because the car had tinted windows, Vanover could only make out that there were two black persons of undetermined gender and age riding in the car. Although he does not state the duration of the period that he followed the car, his affidavit indicates that he did so for as much as a few minutes.[7] During that time, Vanover radioed a police dispatcher

[6]Vanover admitted that he could not distinguish among Novas with the model years 1973-82.

[7]The affidavit claims that Vanover, and later Nacogdoches Police Officer Lamonte, tailed the car as it made turns on a number of streets. This contradicts Lampkin and Daniels' statement that they drove only one or two blocks from Lampkin's mother's residence to their own house.

and requested a registration check on the Nova's license plate number. Before the check could be completed, however, the Nova pulled into the driveway of a private residence. Officers Vanover and Lamonte, in separate patrol cars, pulled up to the driveway and immediately exited their vehicles, brandished their service revolvers, and instructed Lampkin and Daniels to raise their hands and move to the back of their vehicle. The officers then frisked Lampkin and Daniels. No weapons or contraband were found during the search.

According to Officer Shotwell's affidavit and deposition testimony, he arrived at 11:04 p.m.[8] in a third patrol car after the initial stop-and-frisk was complete. According to Shotwell, while Vanover was explaining to Daniels and Lampkin why they had been stopped and frisked, he (Shotwell) glanced inside the Nova, either through an open window on the driver's side or—according to Vanover—through an open door of the car. At any rate, Shotwell states that he observed a white substance that he believed was "crack" cocaine on the passenger's seat. Before actually entering the Nova's passenger compartment to inspect further, he immediately reported to Vanover that he had discovered "crack" cocaine. Vanover proceeded to handcuff Daniels and place him in the back of his patrol car. Shotwell handcuffed Lampkin and placed her in his patrol car. Shotwell then searched inside the front compartment of the Nova and discovered that the "crack" was in fact a piece of mint candy. A bag of similar candies was discovered nearby. The officers immediately called off their search of the Nova and released Lampkin and Daniels. The entire episode, according to Vanover and Shotwell, took ten to twelve minutes—half of the duration according to Lampkin and Daniels' account.

Officer Vanover's deposition testimony regarding the search and seizure is significant. Vanover admitted that once Lampkin (a female) exited the Nova, he had substantial doubts about whether he and his colleague had apprehended the right persons, given the Lufkin police reports describing only male suspects. In a similar vein, Vanover admitted that as soon as he exited his patrol car at Lampkin and Daniels' driveway, he noticed that the Nova was not blue and white, but white

---

[8]This places Shotwell, who claims that he arrived *after* Vanover and Lamonte had completed the initial stop-and-frisk at the scene four minutes *before* the time at which Vanover claims to have spotted Lampkin and Daniels' car.

with a black vinyl top and gold trim. Vanover also admitted that he realized that Lampkin and Daniels were adults. Finally, Vanover admitted that once he realized that the "crack" on the passenger's seat was in fact candy, he immediately ceased any further searching for weapons, even though a search for weapons had been the only purpose for detaining Lampkin and Daniels in the first place.

Nowhere in Shotwell or Vanover's deposition testimony or affidavits did they directly deny Lampkin and Daniels' allegations about the physical force used against Daniels' person and Lampkin's property. However, in his deposition testimony, Nacogdoches Police Officer Mark Lamonte claimed that he did not witness such force being applied to Daniels.

Lampkin and Daniels filed a civil rights complaint against Officers Vanover and Shotwell—in both their individual and official capacities—and against the City of Nacogdoches. The complaint raises three main constitutional claims,[9] alleging an unconstitutional seizure of Lampkin and Daniels; an unconstitutional search of Lampkin's and Daniels' persons as well as their automobile; and the use of excessive force against Daniels' person and Lampkin's personal property.

After the above-mentioned discovery occurred, Vanover and Shotwell filed a motion for summary judgment regarding the search and seizure claims but not the excessive force claim, and raising the defense of qualified immunity; they claimed that the latter defense entitled them to immunity from suit in their individual capacities. The district court denied the motion, holding:

> The Court finds that there are genuine and material issues as to whether the investigatory stop conducted by Officers Vanover and Shotwell was reasonable under the circumstances. The Court also finds that it cannot grant summary judgment on the basis of the "qualified immunity" doctrine since the doctrine requires that the Defendants' actions not be objectively unreasonable in light of well-established law.... A determination of whether Defendants' actions were objectively reasonable necessarily involves a question of fact.

Vanover and Shotwell filed an interlocutory appeal from the district court's denial of summary judgment on the question of qualified immunity.

II.

DISCUSSION

---

[9]A number of state law pendent claims were also raised.

Because this case is on appeal from a summary judgment motion, we review the record *de novo,* examining the evidence in the light most favorable to the non-movant. *See Pfannstiel v. City of Marian,* 918 F.2d 1178, 1183 (5th Cir.1990). Appellants will prevail if they have demonstrated that there are no genuine issues of material fact and that they are entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). We cannot agree with their assertion that there are no disputed issues of fact material to questions of qualified immunity.

As the Supreme Court has recently instructed us, the first inquiry in the examination of a defendant's claim of qualified immunity is whether the plaintiff has "alleg[ed] the violation of a clearly established Constitutional right." *Siegert v. Gilley,* --- U.S. ----, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Appellees contend that they were unlawfully stopped, detained and arrested because the officers had grossly inadequate information on which to justify their actions. They also contend that the officers' actions were objectively unreasonable and violated well-established law. More precisely, Lampkin and Daniels assert somewhat overlapping violations. They contend that the officers did not have a factual basis to detain them, that the officers arrested them without a warrant or probable cause, and that the officers had no reasonable basis to search their vehicle. The district court's ruling denying summary judgment on qualified immunity reflects these overlaps. The court found genuine and material issues of fact "as to whether the investigatory stop conducted by Officers Vanover and Shotwell was reasonable under the circumstances." It also held that whether appellants' actions were objectively unreasonable for qualified immunity purposes necessarily "involves a question of fact."

The implicit assumption of both appellees and the district court seems to be that whether the officers were wrong in deciding to make an investigatory stop or "arrest" and search of the vehicle, and whether their actions were "objectively unreasonable" under the immunity doctrine are questions that must be decided by the trier of fact. This assumption would be incorrect.

After this case was decided by the district court, the Supreme Court corrected remarkably similar errors in *Hunter v. Bryant,* --- U.S. ----, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The analysis of *Hunter* guides our decision. In *Hunter,* a panel of the Ninth Circuit had divided on the question

whether Secret Service Agents had probable cause to arrest a man who had written a letter suggesting a possible assassination attempt on the President's life. The majority concluded that the agents had failed to sustain their burden of establishing qualified immunity because the agents misinterpreted the alleged threatening letter the defendant had written. The Supreme Court described the majority's "confusion" over the immunity defense as arising from its statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment ... based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach. 903 F.2d, at 721." Commenting on this conclusion, the Supreme Court stated:

> This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. *See Mitchell [v. Forsyth],* 472 U.S. [511], at 527-529, 105 S.Ct. [2806], at 2815-2817 [, 86 L.Ed.2d 411 (1985) ]. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

--- U.S. at ----, 112 S.Ct. at 536-37.

The Court emphasized that qualified immunity shields officers from a damage suit if they could have reasonably believed their actions to be lawful, "in light of clearly established law and the information the [arresting] officers possessed." *Hunter,* --- U.S. at ----, 112 S.Ct. at 536, quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Even if law enforcement officials erred in concluding that probable cause existed to arrest Bryant, they would be entitled to qualified immunity if their decision was reasonable, albeit mistaken. *Id.* As the Court repeated, the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley [v. Briggs],* 475 U.S. [335], at 343, 341, 106 S.Ct. [1092], at 1097, 1096 [89 L.Ed.2d 271]. *Id.*

It must be recognized that even though *Bryant* diminished the jury's role in qualified immunity cases, it did not entirely abolish it. *See Bryant,* --- U.S. at ----, 112 S.Ct. at 537 (criticizing Ninth Circuit for "*routinely* plac[ing] the question of immunity in the hands of the jury" and noting immunity "*ordinarily* should be decided by the court") (emphasis added). Rule 56 still has vitality in qualified immunity cases if the underlying historical facts in dispute that are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing

law and facts available to them.

Although its brief opinion is slightly ambiguous, the district court would appear to have committed post-*Bryant* error by holding that the objective reasonableness prong of the qualified immunity standard is generally a factual question for the jury. Nevertheless, we will not reverse if the district court's denial of summary judgment was correct on other grounds apparent in the record.[10] After a painstakingly detailed review of the record, we find that summary judgment indeed should have been denied because of myriad genuine issues of material historical fact. Put another way, based on the present disputed state of factual development, it is not now possible to conclude as a matter of law—considering the evidence in a light most favorable to Lampkin and Daniels—that Officers Vanover and Shotwell acted in an objectively reasonable manner, even under *Hunter v. Bryant.*

The record reflects that Lampkin and Daniels are a black man and woman, resident in Nacogdoches, who drove a black and white older model Chevy Nova into the driveway of their home from Lampkin's mother's home on the night of July 4, 1990. They were detained by a "felony stop" procedure, frisked, possibly roughed up, handcuffed and placed in separate police cars for up to thirty minutes before being released. Although no weapons were found or even thoroughly searched for in their cars, they were accused of harboring "crack" cocaine, which turned out to be candy mints.

The appellants asserted that they were objectively reasonable in mistaking Lampkin and Daniels for two young black males from Lufkin, heavily armed, driving a blue and white 1978 Chevy Nova, who had left Nacogdoches possibly on July 3, cruising in search of revenge for a gang-related killing.

The problem this court has in evaluating the basis for the officers' actions is the same as that sensed by the district court. The facts leading up to these mistakes are not consistent among various officers' testimony and affidavits. Whether they had an objectively reasonable basis (a) to detain or (b) to arrest Lampkin and Daniels cannot be sorted out without settling on a coherent view of what happened in the first place. *See, e.g., Presley v. City of Benbrook,* 4 F.3d 405 (5th Cir.1993).

---

[10]*See Coral Petroleum, Inc. v. Banque Paribus-London,* 797 F.2d 1351, 1355 n. 3 (5th Cir.1986) (*citing Davis v. Liberty Mutual Insurance Co.,* 525 F.2d 1204, 1207 (5th Cir.1976)).

Moreover, the determination of objective reasonableness must be based on a version of the facts most favorable to the plaintiffs. As for the VCR and the force applied to Daniels, the issue of objective reasonableness must be determined in light of appellees' allegations of excessive force because appellants' evidence did not directly contradict appellees' allegations regarding those matters.

The present state of the record does not permit us confidently to state that there are no triable fact issues. Further pretrial proceedings in the district court may solve this problem, and it must be remembered that immunity should ordinarily be resolved at the earliest possible stage of litigation. *Hunter, supra,* --- U.S. at ----, 112 S.Ct. at 536-37. To the extent that credibility questions exist, of course, a fact-finder will be necessary.

Because the record as it presently stands appears to suggest disputed issues of material fact relevant to the officers' qualified immunity defense, the defense cannot now prevail as a matter of law, and this court is without jurisdiction to consider their interlocutory appeal. Consequently, the appeal is *DISMISSED.*