**Travis ALTON**

v.

**Major General Ted HOPGOOD, et al.**

**Civil Action No. G–97–393.**

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 18, 1998.

Ross Citti, Citti and Crinion, Houston, TX, pro se.

Jerry C. Parker, William S. Hommel, Jr., Sammons and Parker, Tyler, TX, for Travis Alton, Michael Alton, Jill Alton.

James C. Todd, Office of Attorney General, Aistin, TX, for Texas A&M University, Thomas Darling, Malon Southland, Robert H. Dalton.

Mark A. Lindow, Lindow and Treat, San Antonio, TX, for Jason Hanson.

Cindy R. Weir–Ervin, Odessa, TX, for Dustin Boyd.

James Edward Maloney, Baker & Botts, Houston, TX, for Javier Chapa.

Richard W.B. Davis, Bryan, TX, for Grayson Hoffman, Luis Torres.

Robin Clay Hoblit, Charvez Gonzales & Hoblit, Corpus Christi, TX, for Kyle Jud.

Kyle Jud, Harlingen, TX, pro se.

Bruce M. Feichtinger, Whittington Pfeiffer & Vacek, Houston, TX, for Christopher Monk.

David Keith Cobb, Archer Shrode and Soule, Houston, TX, for Michael Poskey.

### ORDER PARTIALLY GRANTING SUMMARY JUDGMENT

KENT, District Judge.

This is a hazing case in which Plaintiff, a former member of the Corps of Cadets at Texas A & M University, alleges violations of· 42 U.S.C. §§ 1983, 1985, 1986 against eight former members of the Corps of Cadets, the present and former Commandant, a faculty advisor of that organization, and the Vice President of Student Affairs at Texas A & M. Plaintiff also asserts negligence and brings claims under Texas' hazing statute, Tex. Educ.Code Ann. § 37.151 *et seq.* Now before the Court is Defendants' Motion for Summary Judgment based on qualified immunity. For the reasons that follow, Defendants' Motion is **GRANTED** in part and **DENIED** in part. Consequently, all of Plaintiff's claims asserted against Defendants HOPGOOD, DARLING, SOUTHERLAND, and DALTON are hereby **DISMISSED WITH PREJUDICE.** All of Plaintiff's claims asserted against the STUDENT DEFENDANTS remain pending.

### I. FACTUAL SUMMARY

Sometimes called the backbone of Texas A & M University because of their high visibility and intense participation in all aspects of University life, Texas A & M's Corps of Cadets ("Corps") is a voluntary student military training organization consisting of approximately 2,100 of the school's 40,000 students. Members of the Corps live together in dorms on what is called the "quad," wear uniforms, participate in daily drill, stand for regular inspections, and physically train on a daily basis. The refrains of their cadences and songs reverberate throughout the campus and their distinctive uniforms pepper the now huge and diverse student body. On a campus still centered around the hallowed ground of the Memorial Student Center, which celebrates the heroic exploits of former Aggies who have been awarded the Congressional Medal of Honor, they constitute a living and vital link to the earliest days of a University founded upon and shrouded with tradition.

Organized much like the military, the Corps has a rigid chain of command which ultimately ends with the Cadet Corps Commander, a senior student, who answers to the Commandant of the Corps, a retired General employed by the University. Members of the Corps, especially the freshmen ("fish"), are subjected to a highly regimented and disciplined system under the supervision of the cadet chain of command. Many Corps members receive ROTC scholarships, and

many more enter active military service following University graduation. All members of the Corps, however, do not enter military service upon graduation, opting instead to seek leadership positions in business, education, and government service.

Plaintiff enrolled at Texas A & M University as a member of the Corps in the fall of 1996. Shortly thereafter, Plaintiff joined the Fish Drill Team ("FDT"), a precision rifle drill unit made up only of freshman Corps members. The FDT, which is run by nine upperclassmen advisors known as "hounds," competes in rifle drill competitions throughout the year. The FDT, which was organized in 1947 partly as an attempt to give the fish some time away from the rigors of upperclassmen meddling, has a high attrition rate due to the stringent training schedule which is above and beyond other Corps duties imposed upon fish.

In his Complaint, Plaintiff alleges that during the week of January 6 through January 13, 1997, the week termed "hell week" by the FDT because it involves intense training prior to the commencement of the spring semester, Plaintiff and other fish in the FDT were subjected to nightly "visits" from the hounds. Plaintiff contends that during these visits, which occurred in Corps dorms at Texas A & M, the student Defendants either witnessed, participated in, or had knowledge of, beatings, kickings, and slappings of FDT members while the fish stood at rigid "attention." During hell week, Plaintiff asserts that he was singled out for special treatment, claiming he had his head taped like a mummy, and had his chapped lips twisted and jerked. Plaintiff does not explain why he received such "special treatment." However, Plaintiff does not contend that *any* of these incidents were reported to school authorities.

The student Defendants' wrongdoing allegedly continued. Following hell week, while the FDT was preparing for the Tulane University Mardi Gras Drill Meet held in New Orleans, Plaintiff alleges that he was pulled from practice by the student Defendants because he had improperly performed a drill movement. Plaintiff contends that because of his mistake, he was taken to the FDT weapons room, where he was grabbed by the throat and choked, repeatedly punched in the face, and repeatedly knocked to the ground. Allowing him to finally leave, Plaintiff alleges the student Defendants told him to inform other members of the FDT about "what happens if you mess up on a movement." Again, no report of this incident was made to school authorities.

The FDT finished second in the Tulane Drill Meet. Thereafter, Plaintiff alleges that because of their disappointment, the student Defendants subjected members of the FDT to intense training to the point of exhaustion. Again, Plaintiff contends that the student Defendants repeatedly punched him in the face and stomach during drill practice. Plaintiff also alleges that, on at least one occasion, he was again knocked to the ground and was repeatedly kicked in the ribs. After the beating, Plaintiff contends that the student Defendants made him run until he fell down suffering from overexertion. Again, no report of these incidents was made to school authorities, although for the first time, Plaintiff did advise his parents.

Near the end of each school year, those members of the FDT that choose to do so can try out for the position of FDT advisor (hound). Plaintiff alleges that the selection process, which includes a "hound interview," is extremely rigorous. Despite his alleged abuse (or because of it), Plaintiff wanted to be a hound. After informing the advisors of his desire, Plaintiff was called into Defendant Hanson's dorm room for his hound interview—a process ostensibly for testing the candidate's fortitude. Upon entering the room, Plaintiff alleges that the student Defendants poked him in the eye and punched him in the face. Then, after being made to sit on a stool, Plaintiff contends that the student Defendants turned out the lights and repeatedly beat him all over his body. After turning the lights back on, Plaintiff alleges that the student Defendants forced him to stand at attention, gave him a knife, and made him cut a three to four inch gash into his shoulder. Plaintiff allegedly was told: "This never happened." All of these alleged actions of the student Defendants clearly contravened both Corps and University policy.

There is some dispute regarding when administrative officials at Texas A & M were made aware of Plaintiff's alleged beatings. Plaintiff alleges that his parents learned of the punishment resulting from the FDT's second place finish at the Tulane Meet and called Colonel Hoffman, an employee on the Commandant's staff, with their concerns prior to the weekend hound interview in which Plaintiff was forced to cut himself. Thereafter, Plaintiff alleges that Defendant Hanson pressured him to recant his story. Plaintiff further alleges that Defendant Dalton had also been advised earlier in the week by Defendant Hanson that a beating had occurred. Plaintiff concedes that on Friday, March 21, 1997, he talked to Captain Dalton, faculty advisor for the FDT employed by the University and Defendant in this case, and downplayed any alleged hazing. He contends, however, that he did so at Hanson's urging. Plaintiff claims that even though Hoffman and Dalton had some knowledge of the incident, Plaintiff was given no protection over the weekend, which resulted in the final beating and knife incident allegedly occurring on Saturday, March 22, 1997. Apparently, even though Plaintiff himself told Captain Dalton that no hazing had occurred, Plaintiff believes more could have been done to prevent the weekend incident.

Defendants, on the other hand, contend that nothing more could have been done, given the sketchy information available to them prior to the weekend incident. Defendants admit that prior to the weekend incident Hanson informed Captain Dalton of a rumor that someone on the FDT had been beaten. Upon further inquiry, however, Dalton contends that Hanson assured him there was no truth to the rumor. Defendants also point to the fact that Plaintiff himself told Dalton nothing happened. Even so, after his meeting with Plaintiff, Captain Dalton asked Colonel McClesky, the Chief of Operations and Training who oversees the investigation of reported misconduct, if any investigation was underway regarding the beating rumor. Captain Dalton alleges that McClesky told him that Colonel Ruiz, head of Army ROTC,

might have some knowledge surrounding the incident. Unfortunately, Colonel Ruiz was unavailable until the following Monday.

At 8:15 a.m. on Monday, March 24, 1997, a meeting was held concerning Plaintiff and what Captain Dalton and Colonel Ruiz had heard about the rumored beating incident. At that meeting, Captain Dalton was instructed to set up a meeting so that General Hopgood, the Commandant of the Corps, could meet with the nine FDT student advisors (hounds). Immediately thereafter, General Hopgood met with Plaintiff and his parents. According to the General, Plaintiff's physical appearance clearly revealed that he had been beaten.

After confirming the veracity of the beating rumor, General Hopgood immediately took Plaintiff and his parents to the University Police to file formal charges. Subsequently, the matter was turned over to the County Attorney's office for prosecution, and to the Student Conflict Resolution Center ("SCRC") for University disciplinary proceedings. Later that afternoon, the FDT advisors were summoned to General Hopgoods office where they were suspended and ordered out of the Corps' dorms. The General, at that point, also ordered that a University officer be present at all FDT activities.[1] Thereafter, all student Defendants were either suspended or expelled for hazing at the University SCRC proceeding. Criminal proceedings with the County Attorney's office remain pending against the student Defendants.

As initially noted, Plaintiff brings this case alleging violation of Texas' hazing statute, TEX.EDUC.CODE ANN. § 37.151 *et seq.*, violations of 42 U.S.C. §§ 1983, 1985, 1986, and negligence against the present Commandant of the Corps, Major General Ted Hopgood, U.S.M.C. retired, the former Commandant of the Corps, Major General Thomas Darling, U.S.A.F. retired, the Vice President for Student Affairs, Dr. Malon Southerland, the faculty advisor to the FDT, Captain Robert Dalton, and eight former members of the

---

1. At the completion of the school year, the FDT was disbanded for a year. Its future will be reviewed and determined in the spring of 1998.

Corps of Cadets who were student advisors to the FDT and who allegedly actually committed the hazing violations. Plaintiff has dismissed with prejudice his claims against Defendant Javier Chapa, another former student advisor of the FDT.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere *existence* of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casualty Co.*, 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553; *see also* FED.R.CIV.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita*, 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87, 106 S.Ct. at 1355–56 (quoting FED.R.CIV.P. 56(e)).

## III. ANALYSIS

### A. Plaintiff's Claims

■ Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983. "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates." *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir.1989). Before he can successfully assert § 1983 as a valid cause of action against these Defendants, Plaintiff must first identify a specific constitutionally protected right that has been infringed. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). In his attempt to establish § 1983 liability against the student Defendants, Plaintiff alleges that he was assaulted by these Defendants in a manner that violated his bodily integrity as recognized by *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981). Conversely, in his attempt to establish § 1983 liability against the nonstudent, administrative Defendants Darling, Hopgood, Dalton, and Southerland, Plaintiff cites two theories. First, Plaintiff claims that these Defendants had a duty to supervise Corps' activities, and their failure

to do so demonstrates a deliberate indifference to Plaintiff's constitutional rights. *See, e.g., Doe v. Hillsboro Indep. Sch. Dist.,* 113 F.3d 1412, 1417 (5th Cir.1997).[2] Alternatively, Plaintiff contends that these Defendants had a special relationship to Plaintiff, which imposes upon them a duty to protect Plaintiff. *See, e.g., Walton v. Alexander,* 20 F.3d 1350, 1354 (5th Cir.1994).[3] Because qualified immunity shields the nonstudent Defendants from liability, as will be discussed below, the Court need not decide today whether Plaintiff's § 1983 claims against the nonstudent Defendants have any legal validity on the facts alleged.

### B. Qualified Immunity of Nonstudent Defendants

■■■ The question of qualified immunity raised by Defendants is a threshold issue that determines their immunity from suit, that is, their ability to avoid a trial altogether, rather than merely their immunity from damages. *See Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993). Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

When sued in their individual capacities, governmental employees are entitled to a presumption of qualified immunity from suit. *See Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990). To overcome this presumption, Plaintiff has the burden to prove that no reasonable, similarly situated, official could have considered the conduct of the government officials to be lawful, under the circumstances known to him at the time. *See Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039–40; *Burns–Toole v. Byrne,* 11 F.3d 1270, 1274 (5th Cir.1994).[4] The reasonableness inquiry of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question. *See King v. Chide,* 974 F.2d 653, 657 (5th Cir. 1992). "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Pfannstiel,* 918 F.2d at 1183.

■■■ "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton,* 29 F.3d 1012, 1017 (5th Cir.1994) (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991)). The Fifth Circuit has developed a two-step process for the examination of a claim of qualified immunity. The first inquiry is whether Plaintiff has

---

**2.** The Fifth Circuit recently analogously explained that "a supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school student's constitutional right to bodily integrity in physical abuse cases if the plaintiff establishes that:
> 1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and
> 2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to ·take action that was obviously necessary to prevent or stop the abuse; and
> 3) such failure caused a constitutional injury to the student."
*Taylor,* 15 F.3d at 454. Of course, no sexual misconduct is here alleged, but the principle is the same.

**3.** An en banc panel later vacated *Walton* and held that a voluntary residential student who has the right to withdraw has no "special relation-

ship" sufficient to obligate school authorities to protect him from assaults by fellow students. See *Walton v. Alexander,* 44 F.3d 1297, 1301–05 (5th Cir.1995) (en banc); *see also Doe v. Hillsboro Indep. Sch. Dist.,* 113 F.3d 1412, 1415 (5th Cir.1997) (en banc) (holding that even compulsory attendance does not create a special relationship). In light of Fifth Circuit pronouncements, Plaintiff's "special relationship" theory appears clearly insupportable.

**4.** Once government officials have asserted qualified immunity and established, as they have here, that the allegedly wrongful acts were undertaken within the scope of their discretionary authority, the burden shifts to the party seeking damages to show that qualified immunity does not bar recovery. *See Todd v. Hawk,* 72 F.3d 443, 446 (5th Cir.1995); *Schultea v. Wood,* 47 F.3d 1427, 1430 (5th Cir.1995); *United States v. Burzynski Cancer Research Institute,* 819 F.2d 1301, 1310 (5th Cir. 1987)

alleged a violation of a clearly established constitutional right. *See King,* 974 F.2d at 657; *see also Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The next step is to judge the reasonableness of the alleged behavior. *See King,* 974 F.2d at 657. When the Court has a clear picture of what occurred during an incident giving rise to the qualified immunity defense, the "reasonableness" question becomes one of law. *See Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir.1993) (acknowledging that qualified immunity *should normally be determined by the Court* ).[5]

▪ For the moment, the Court assumes that the theories upon which Plaintiff relies to attach liability to the *nonstudent* Defendants are those clearly established to be constitutional violations.[6] Qualified immuni-

ty in this case, therefore, rests on whether reasonable government officials in the shoes of the nonstudent Defendants would have known that their actions violated clearly established law. *See King,* 974 F.2d at 657.[7]

▪ As there is no vicarious liability under § 1983, a plaintiff must show that the defendant personally caused or participated in the deprivation of a federal right. *See Thompkins v. Belt,* 828 F.2d 298, 303–04 (5th Cir.1987). In his submissions to the Court, Plaintiff does not brief the liability of the Defendants individually. However, the Court understands that because each nonstudent Defendant in this case has a different role at Texas A & M, they each potentially have a different exposure to liability. Defendant General Darling stepped down as Commandant four months before Plaintiff en-

---

5. Although the Fifth Circuit has clearly established a two-step inquiry for qualified immunity, confusion abounds in the case law and in the briefs submitted to this Court. The following is offered to illuminate this issue. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action assessed in the light of the legal rules that were "clearly established" at the time it was taken. *See Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038; *Salas,* 980 F.2d at 310; *Duckett v. City of Cedar Park, Texas,* 950 F.2d 272, 279–80 (5th Cir.1992); *Texas Faculty Association v. University of Texas at Dallas,* 946 F.2d 379, 389 (5th Cir.1991); *Pfannstiel,* 918 F.2d at 1183; *Mouille v. City of Live Oak,* 918 F.2d 548, 552–53 (5th Cir.1990); *Bigford v. Taylor,* 896 F.2d 972, 974 (5th Cir.1990). For the legal rules to be considered "clearly established," the contours of the right alleged to have been violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates the right"; that is, "in the light of preexisting law the unlawfulness must be apparent." *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *Pierce,* 117 F.3d at 871; *Salas,* 980 F.2d at 310; *White v. Taylor,* 959 F.2d 539, 544 (5th Cir.1992). While there need not have been a specific ruling squarely on point for the issue in question, the law must have been sufficiently clear to put the official on notice of the impropriety of his actions. *See Pierce,* 117 F.3d at 871–72; *Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521, 530 (5th Cir.1996); *Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1078 (5th Cir.1995); *Salas,* 980 F.2d at 310. The question "is not whether the law was settled, viewed abstractly, but whether, measured by an objective standard, a reasonable officer would know that his action was illegal." *Click v. Copeland,* 970 F.2d 106, 109 (5th Cir.1992) (internal

quotations omitted). The Fifth Circuit has directed courts to examine only Supreme Court and Fifth Circuit precedent in the course of determining whether a legal principle is "clearly established"; the law of other Circuits does not control this determination. *See Brady v. Fort Bend County,* 58 F.3d 173, 175–76 (5th Cir.1995); *Boddie v. City of Columbus, Mississippi,* 989 F.2d 745, 748 (5th Cir.1993).

6. No party in this case contends that Plaintiff does not have a clearly established right to be free from the type of harm which he alleges befell him at the hands of the student Defendants. Supplemental briefs discussing the reasonableness inquiry were submitted by both sides, and have, like all of the voluminous submitted materials, been carefully considered.

7. Semantically, there are several ways to phrase this inquiry. The inquiry boils down to whether a reasonable official would believe his conduct to be deliberately indifferent in violation of the United States Constitution.

Because the nonstudent Defendants' conduct was objectively reasonable, invoking qualified immunity, the Court need not determine whether on these facts the special relationship theory or failure to supervise claim are clearly established constitutional law. Of course, Defendants in this case argue that the constitutional rights at issue in this case are not clearly established. Although holding that qualified immunity shielded the defendant's from liability, at least one Court has held on similar facts that such rights are clearly established. *See Nesmith Through Nesmith v. Grimsley,* 702 F.Supp. 122, 124 n. 1 (D.S.C.1988) (observing that the students of The Citadel had a special relationship with the command staff, but denying liability on qualified immunity grounds).

rolled in the Corps. Simply because he stepped down, however, does not mean that the policies implemented by General Darling could not potentially violate Plaintiff's rights. Defendant General Hopgood was Commandant when the alleged hazing occurred. Captain Dalton served as faculty advisor to the Corps. Defendants argue that as faculty advisor, Captain Dalton had no authority over the FDT and therefore cannot be liable under § 1983. *See Doe v. Rains County Indep. Sch. Dist.,* 66 F.3d 1402, 1410–11 (5th Cir.1995). Understanding the willingness of Corps members, especially those in the freshman class, to follow the orders of anyone in military uniform, the Court emphatically rejects this argument. Although called an "advisor," the Court absolutely believes and finds that, as a *practical* matter, Captain Dalton clearly had authority over FDT members. Along with that authority comes some responsibility to report and prevent constitutional violations. Moreover, it is clear that Dr. Southerland, who is above General Hopgood in the chain of command, derived his information from the General. This does not mean, however, that Dr. Southerland had no responsibility to prevent occurrences such as alleged here.

To varying degrees, the relevant conduct in this case consists of those actions taken by the nonstudent Defendants to prevent hazing and those actions taken by the nonstudent Defendants once hazing was reported. Plaintiff provides summary evidence of what is ostensibly twenty-eight hazing incidents which occurred during a two-year period. At first glance this evidence appears quite damaging for Defendants. After a careful review, however, the Court finds that not all of these incidents can be fairly categorized as hazing. Moreover, it appears from the documents submitted that some discuss the same incidents, making the number of "incidents" approximately twenty-four, rather than twenty-eight. Furthermore, from the sketchy information provided by Plaintiff, even if they are "hazing" as defined in the Texas statute, it appears that few of these incidents rise to

a constitutional level. It also appears that no misconduct was ever reported to the nonstudent Defendants that even *approached* the severity of the conduct alleged in this case. It is clear, however, that the policy regarding these incidents, and the responses thereto, are relevant in the reasonableness inquiry.

After protracted deliberation, the Court finds that reasonable officials, in the shoes of the nonstudent Defendants, could have concluded that their actions, both collectively and individually, would prevent constitutional violations.[8] Texas A & M and the Corps each have anti-hazing policies that closely track the language of Texas' anti-hazing statute. Both Texas A & M and the Corps regularly distribute brochures and other materials to students to explain, in common-sense, nonlegal terms, what hazing is and how to prevent it. Each fall, prior to commencement of the semester, Corps members are issued a written explanation of the hazing policy and are required to sign a form acknowledging that they have read and understand this policy. Moreover, each summer, the Corps Commandant meets with incoming students and their parents, in small groups, to discuss the hazing policy and to encourage parents to report any wrongdoing if it becomes known. Additionally, Corps hazing policy was specifically discussed with the student Defendants in January, 1997, prior to the FDT's hell week. The evidence reveals that each nonstudent Defendant knew of, and disseminated, the Corps and University anti-hazing policy. The nonstudent Defendants' efforts to educate Corps members in regards to hazing were actions that reasonable officials would take. Moreover, the Court concludes that reasonable officials would believe these efforts adequate to prevent constitutional violations.

Likewise, the Court finds that reasonable officials, in the shoes of the nonstudent Defendants, would believe that their corrective efforts would prevent constitutional violations.[9] The summary judgment evi-

---

8. The Court agrees with Defendants that an act of hazing may not necessarily rise to the level of a constitutional violation. *See Pierce v. Smith,* 117 F.3d 866, 871 n. 5 (5th Cir.1997).

9. In *Taylor,* the Fifth Circuit disallowed the qualified immunity defense to a school principal who had repeatedly refused to investigate numerous reported incidents of sexual misconduct by a

dence in this case reveals that whenever cadet misconduct was reported, it was immediately investigated. The evidence further demonstrates that upon investigation, if infractions were found, appropriate and even harsh disciplinary action was promptly taken. For instance, upon discovery of an incident where upperclassmen gave "licks" to fish with an axe handle and where underage drinking occurred, the ·Corps unit involved was disbanded. Two other units were disbanded for similar violations. Moreover, in response to the incident involved in this case, General Hopgood disbanded the FDT, severely punished the offenders by removing them from Corps housing, and referred them to SCRC where they were all suspended or expelled from the University. General Hopgood then issued emphatic statements to Corps members reiterating his intolerance of hazing. Plaintiff offers no evidence sufficient to overcome the qualified immunity obstacle that any of the nonstudent Defendants ignored potential constitutional violations, or encouraged, condoned, or facilitated the alleged behavior of the student Defendants.

Plaintiff contends that on several occasions Defendant General Hopgood categorized reported misconduct as something other than hazing and did not refer those cases to the SCRC as he is required to do. Plaintiff contends that on these occasions, a reasonable official in the General's shoes would realize that his conduct would lead to constitutional violations. This Court disagrees. The Court finds unpersuasive Plaintiff's assumptive and conclusory allegation that General Hopgood's classification of these incidents demonstrates the existence of a conspiracy. The summary judgment evidence reveals that General Hopgood was given the authority to refer to the SCRC those incidents in which he felt hazing had occurred. As Commandant of the Cadet Corps, the General is paid to exercise his judgment. This Court's role is not to second-guess that judgment, so long as his actions meet the qualified immunity standard. They do.

After a careful and exhaustive review of the summary judgment evidence submitted, this Court concludes that because reasonable public officials could differ on the constitutional lawfulness of the nonstudent Defendants' behavior, they are entitled to qualified immunity. *See Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir.1997). There is simply insufficient evidence in this case which reveals that the nonstudent Defendants learned of facts or a pattern of inappropriate behavior that would lead a reasonable official to conclude that Plaintiff's constitutional rights would be, or were being, violated. Moreover, the evidence simply fails to show that a reasonable official would have concluded that Defendants' actions in response to hazing reports would fail to remedy and prevent further occurrences. Because Plaintiff fails to prove that no reasonable, similarly situated, official could have considered the conduct of the government officials to be lawful, under the circumstances known to him at the time, as to the nonstudent Defendants, the Defendants' Motion for Summary Judgment must be **GRANTED**. *See Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039–40; *Burns–Toole v. Byrne,* 11 F.3d 1270, 1274 (5th Cir.1994).

*C. Student Defendants*

 From the pleadings, it is unclear whether the student Defendants in this case seek qualified immunity. What is clear, however, is that these student Defendants are not entitled to such immunity. As stated above, it is clearly established that Plaintiff has a constitutional right to his bodily integrity. *See Shillingford,* 634 F.2d at 265. Moreover, any assertion by the student Defendants that objectively reasonable persons in their position would think their conduct was not violatory of Plaintiff's constitutional rights is asinine on its face. Therefore, to the extent qualified immunity is asserted by the nonstudent Defendants in this case, Defendants' Motion is **DENIED**.

The Court also notes that various Motions to Dismiss have been submitted by individual

biology teacher. In that case, the principal was on notice that a pattern of inappropriate behavior was occurring. In the case at bar, however,

Defendants took numerous steps to prevent hazing and promptly dealt, sometimes severely, with hazing once it was reported.

student Defendants. After careful review of the case authority in regards to each of the student Defendants, the Court notes that Plaintiff has met the threshold requirements of Rule 12(b)(6). *See* FED.R.CIV.P. 12(b)(6). Therefore, the pending Motions submitted by the student Defendants in this case are hereby each and all **DENIED**.

## IV. CONCLUSION

At the core of this emotional and troubling case is the tension inherent in Texas A & M University's modern, dual mission. On the one hand, Texas A & M is a state-funded institution that openly and vocally seeks to be a world class organization producing the national and international leaders of tomorrow, in a broad range of fields, with a sense of enlightenment and inclusion. Indeed, in many academic areas, Texas A & M literally leads the world. It is clear that Texas A & M is well on its way to becoming an international leader in academia as it continues to produce top caliber graduates trained in medicine, science, engineering, business, and management. Concurrently, Texas A & M has always produced excellent military leaders who have consistently proven their mettle in this country's hardest battles. Indeed, several Medal of Honor winners have hailed from Texas A & M's leadership training grounds, she provided more officers for the American military in World War II than even the service academies, and tearful Aggie Musters have proudly gathered in the ashes of Corrigador and on the bloody fields of Europe, Korea, Vietnam, and the Middle East. Texas A & M University is steeped with its long and proud military tradition; however, this tradition is not a vestige of an ancient past. Instead, Texas A & M's Corps continues to provide a ready source of quality officers with uniquely refined leadership skills to the military establishment. Many of these individuals continue to distinguish themselves in the Armed Services, serving with honor most recently in Haiti, Somalia, and Desert Storm.

There is a vast difference between the rigorous training required to equip future soldiers with the mental and physical skills they need to "close with and destroy the enemy," and the equally valid desire of the University to matriculate persons with the compassion and enlightened skills necessary to succeed in modern society and business. American society's desire to have a strong and capable military must be carefully balanced against its equally valid desire to treat others with respect in accordance with evolving societal norms. When those charged with balancing these equally valid concerns are no more than twenty years old, serious mistakes are sometimes made, and as in this case, the victims are starry-eyed children.

This Court believes that the nonstudent Defendants could have done a better job to prevent what happened to Plaintiff, and they should take no smug satisfaction in their technical extraction from this case. It is clear that individuals holding supervisory positions, like the Corps Commandant, the Vice President of Student Affairs, and others on staff, must set the proper standard for members of the Corps to follow. Moreover, given the favorable and enormous publicity and prestige that Corps organizations like the Ross Volunteers, Fish Drill Team, Aggie Band, and the cadet keepers of Reveille bring the University, it is preposterous to suggest that the University has no economic interest in perpetuating the Corps. Indeed, one would think that all persons in leadership positions within the University would take a personal interest in ensuring that no activities take place in the Corps which would endanger either its superb reputation or even its very survival. It would seem that all at Texas A & M would go to great lengths to preserve this proud organization which has existed since the infancy of the University. Yet, as discussed above, the Court's belief that Defendants could have done a better job is of no moment in the qualified immunity analysis. *See Scott v. Moore*, 114 F.3d 51, 55 (5th Cir.1997) (en banc) (upholding grant of qualified immunity even though the evidence proffered by the plaintiff could be construed to suggest that the city could have done more to prevent an assault on the plaintiff because the defendants' conduct did not demonstrate objective deliberate indifference).[10] The evi-

10. "Most recently, the Supreme Court has re-

minded us that for purposes of liability under

dence simply fails to show that Defendants' action, or inaction, would lead a reasonable government official to believe that Plaintiff's constitutional rights would be violated.

The facts of this case sufficiently present a disturbing picture to create a sense of ambivalence for the Court. Because of the seriousness of the incidents here involved, the Court is tempted to deny qualified immunity to the nonstudent Defendants and hold them accountable in an effort to forever prevent such abuses in the future. On the other hand, too harsh a treatment might induce the University to intemperantly dispose of one of its most cherished and vital institutions. Fortunately, in such a balance, however, this Court is bound by Fifth Circuit precedent. That precedent clearly requires a cloak of immunity over the nonstudent Defendants in this case because, even though what happened to Plaintiff is egregious, these Defendants meet the legal standard. The grant of qualified immunity in this case, again, should in no way be taken as an endorsement of the alleged actions or inactions of these Defendants. The Court is simply bound by the law. The Court instructs Defendants, however, that this case will remain in its memory banks in the coming years. If these or successor Defendants appear here in the future under similar circumstances, the qualified immunity issue will be closely re-examined and critically analyzed. Additional incidents of this nature could be fatally dispositive in the reasonableness inquiry of qualified immunity.

The Court also notes that neither side of this controversy escapes this case unscathed. Obviously, it goes without saying that if the conduct of the student Defendants occurred as alleged, Plaintiff has genuinely and unjustifiably suffered. Likewise, because of this incident, Texas A & M has a blemish on its proud history and tradition. Moreover, after having already been expelled from the Corps, and expelled or suspended from the University, the nonstudent Defendants face continued civil and criminal liability. There are clearly no winners here, and many losers.

Finally, the Court understands that its holding today, as a practical matter, prevents any substantial monetary recovery by Plaintiff by removing the nonstudent parties from the case. It is not this Court's obligation, however, to ensure that "deep pockets" exist for every aggrieved Plaintiff that appears here. No matter what its subjective feelings, this Court must, to the best of its ability, apply the law in accordance with the United States Constitution and binding case authority. That, no more and no less, is what it has done.

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part. Consequently, all of Plaintiff's claims asserted against Defendants HOPGOOD, DARLING, SOUTHERLAND, and DALTON are hereby **DISMISSED WITH PREJUDICE,** and all pending Motions submitted by the STUDENT DEFENDANTS are hereby **DENIED.** The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date. The parties are also **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider or the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED**

### *PARTIAL FINAL JUDGMENT*

For the reasons set forth in the Court's Order issued in this matter this day, all of Plaintiff's claims asserted against Defendants HOPGOOD, DARLING, SOUTHERLAND, and DALTON are hereby **DISMISSED WITH PREJUDICE.** All other claims remain pending, subject to further Orders of the Court. The parties are **ORDERED** to bear their own taxable costs and expenses

---

§ 1983, 'deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' " *Scott,* 114 F.3d at 55 n. 4

(quoting *Board of County Comm'rs v. Brown,* 520 U.S. 397, ——, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997) (other quotations omitted)).

incurred herein to date. The parties are also **ORDERED** to file no further pleadings on these issues in this Court, *including motions to reconsider or the like,* unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**AS TO THE DISMISSED CLAIMS, THIS IS A FINAL JUDGMENT.**