**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-30241

_____

GERALD BURGE,

Plaintiff-Appellee-Appellant,

v.

ST. TAMMANY, PARISH OF, ET AL.;

Defendants,

ST. TAMMANY PARISH DISTRICT ATTORNEY'S OFFICE; WALTER REED,

Defendants-Appellees,

and

PATRICK J. CANULETTE, Sheriff, in his official capacity as
Sheriff of the Parish of St. Tammany; GARY HALE,

Defendants-Appellants.

_____

GERALD BURGE,

Plaintiff-Appellee,

v.

PATRICK CANULETTE, in his official capacity as Sheriff
of the Parish of St. Tammany, et al.,

Defendants,

PATRICK CANULETTE, in his official capacity as
Sheriff of St. Tammany,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

August 25, 1999

Before DAVIS, JONES, and DENNIS, Circuit Judges.[*]

DENNIS, Circuit Judge:

Plaintiff Gerald Burge ("Burge") was imprisoned for nearly five years for a crime of which he was later exonerated. In 1986, a sheriff's deputy allegedly facilitated Burge's conviction of the second degree murder of Douglas Frierson ("Frierson") in St. Tammany Parish, Louisiana, by suppressing a pretrial statement by the victim's mother that would have impeached her perjured testimony that she saw Frierson leave her house with Burge shortly before the homicide. After that statement and other suppressed exculpatory evidence came to light, Burge was granted a new trial and acquitted by a jury in 1992.

Burge brought civil actions for damages in the United States District Court against the District Attorney and the Sheriff of St. Tammany Parish, Louisiana, and a number of assistant district attorneys and sheriff's deputies, under 42 U.S.C. § 1983, the Louisiana Constitution, and state tort law. The gravamen of these actions is that the suppression of exculpatory evidence in violation of Burge's constitutional right to due process was caused by: (1) the deliberately indifferent policies and customs of the

---

[*]Judge Jones concurs in the opinion, except for the discussion in part IV (A) (1)(b), (c) and (d), in which she concurs as to the judgment only.

2

Sheriff and the District Attorney, in their official capacities, regarding the supervision and training of employees in the handling of exculpatory evidence; and (2) the intentional acts and omissions of their individual deputies and assistants in the introduction of false evidence and suppression of exculpatory evidence.

The present appeals arise from motions for summary filed by the defendants in Burge's civil action. The district court granted them in part and denied them in part. Burge and several of the defendants appealed from a number of the district court's rulings that were adverse to them.

## I. FACTUAL BACKGROUND

At approximately 4:13 a.m. on October 17, 1980, the body of Douglas Frierson was found under a bridge in St. Tammany Parish. He had been shot to death in the abdomen, shoulder, and head with a large caliber weapon. It appeared that he had been killed only an hour or so before his corpse was found. When Glenda Frierson ("Glenda"), the victim's sister, was informed of her brother's death, she related the news by telephone to his friend, Gerald Burge. Burge called the St. Tammany Parish Sheriff's Office (the "Sheriff's Office") at about 8:30 a.m., verified the report, and told Chief of Detectives E.L. Hermann, Jr. ("Lt. Hermann") that on the night of the murder Frierson had visited his home and departed at about midnight on foot. Lt. Hermann assigned Detective Gary Hale ("Hale"), who had inspected the murder scene and the victim's body soon after its discovery, to investigate the murder.

3

## A. The Murder Investigation and
## The Allegedly Withheld Exculpatory Evidence

On October 17, 1980, Hale took a recorded statement (later transcribed) of Mrs. Jean Frierson ("Mrs. Frierson"), the victim's mother. Mrs. Frierson told Hale that her son ate pancakes at her home in Picayune, Mississippi at about midnight on October 16, 1980 and that at approximately 12:50 a.m. on October 17, 1980 Frierson was picked up by someone in a car. Mrs. Frierson said that she did not see the vehicle or the person or persons with whom her son left.

On October 17, 1980, Hale also took a recorded statement from Frierson's 12-year-old brother, Ricky Frierson ("Ricky"), who told Hale that at approximately 12:50 a.m. on October 17, he saw Burge and Joe Pearson ("Pearson") drive up to Mrs. Frierson's residence in Burge's red Cadillac with a white top. Although Ricky said that he did not see his brother get in the car, he told Hale that he saw Frierson sitting in the back seat of the vehicle as it drove away.

On October 18, 1980, Hale interviewed Pearson, who said that he did not leave his home on October 16 or 17, and that his girlfriend, Jo Ella Prestwood ("Prestwood"), could confirm his whereabouts at the time of Frierson's murder.

On October 21, 1980, Hale interviewed Burge, who said that on the night of the murder he picked up Frierson at his mother's home in Burge's red and white Cadillac and that he dropped off Frierson at a convenience store between 11:30 p.m. and 12:30 a.m. This

4

second statement was partially inconsistent with Burge's first statement in which he said Frierson left his house at midnight on foot. Burge also told Hale that although he had a Ruger Blackhawk .44 magnum weapon, he had given Frierson the .44-caliber gun to sell approximately one week before the murder. In October 1980, an officer from the New Orleans Police Department, where the autopsy was performed, told Hale that the bullets taken from Frierson's body probably were fired from a Ruger Blackhawk .44-caliber weapon.

On October 22, 1980 Hale interviewed Bernice Frierson ("Bernice"), the victim's brother, who stated that on October 13 he saw Burge with a .44-caliber weapon, and that Burge told him that he would kill anyone before he would go to jail. Bernice also said that on this date Burge told him that he and Pearson had quarreled over money that Pearson owed Frierson from a drug deal, and that Burge later told him that he had picked up Frierson on the night of the murder because Frierson wanted to make a phone call.

On October 24, 1980, based on an arrest warrant supported by the sworn affidavit of Hale, Burge was arrested for the murder of Frierson. Burge was released one week later when the District Attorney's Office decided not to prosecute for lack of sufficient evidence.

At some time during the murder investigation, Hale also prepared an undated final résumé. In this report, Hale disclosed that when Burge called Lt. Hermann on the morning Frierson's body was found, Burge did not ask "where the victim was found or how the

5

victim was killed or what time the victim was discovered." Hale also referred to a second interview with Ricky Frierson on October 23, 1980. In this later interview, Ricky stated that Burge told Ricky that he must have been "mistaken" when he told Hale that he saw Burge and Pearson pick up Frierson on the night of the murder; and that the third person in the car actually was an unnamed woman. The résumé also reflects that Hale had obtained a written statement from Sgt. B. Smith of the Picayune Police Department indicating that at 12:45 a.m. on October 17, 1980, she saw Frierson at a lounge in Picayune, Mississippi with Johnny Milstead, Paul Johnson, and Bobby Frierson, the victim's cousin. Hale's résumé also refers to taped statements from Milstead, Johnson, and Bobby Frierson confirming that they had been drinking with Frierson that night. However, according to the résumé, Bobby Frierson told Hale that they took Frierson home at approximately 12:30 a.m.

Hale also prepared an undated handwritten "supplemental report" stating that on April 21, 1981 Detective David Brooks of the Mississippi Highway Patrol told Hale that Rhonda Spears ("Spears") told him that she heard Pearson admit that he had killed Frierson. According to Hale's report, Chief Ladner of the Hancock County, Mississippi Sheriff's Office was present during this conversation. In this handwritten résumé, Hale also indicated that he had interviewed a private investigator and a bail bondsman who told him that they had spoken with Prestwood on April 16, 1981, and that she told them that Pearson made "statements which caused her

6

to believe that Pearson and Burge had murdered Frierson."

On April 21, 1981, Hale took a recorded statement from Prestwood, who said that at midnight on the night of the murder, Burge picked up Pearson in his red and white Cadillac and that Pearson returned at approximately 4:00 a.m. Prestwood also told Hale that Pearson told her to tell the police that he had been with her on the night of the murder. She also disclosed that Pearson told her that Frierson had been "ratting" on Burge and him and that he (Pearson) had shot Frierson in the head.

In the summer of 1981, Hale resigned from the St. Tammany Parish Sheriff's Office and became chief investigator and jailer for Pearl River County in Mississippi. Hale left the law enforcement field in late 1983. In 1983, Hale married Glenda Frierson, Frierson's sister, whom he met and began dating during his investigation of her brother's murder.

On November 23, 1983, Detective Mike Moore of the St. Tammany Parish Sheriff's Office, who continued the investigation after Hale's resignation, obtained another recorded statement from Prestwood in which she admitted that she lied when she originally told Hale that Pearson had been with her on the night of Frierson's murder. Prestwood also said that Pearson told her a few days after the murder that Frierson was a "rat" and that he told her "we got his head blown off."

## B. Burge's First Murder Trial

While Burge was serving a sentence in a Mississippi prison on

7

an unrelated conviction of receiving stolen property, Pearson confessed to authorities that he and Burge picked up Frierson at midnight on October 16 and drove him to a bridge on Highway 90, where they argued over money and Burge shot Frierson several times. Pearson also stated that Burge threw the gun off Interstate 10 into Lake Pontchartrain.

In 1983, Burge and Pearson were indicted for the second degree murder of Frierson. In April 1984, prior to District Attorney Reed's taking office in January 1985, Burge's attorney filed a *Brady* motion, requesting any and all exculpatory evidence.[1] In July 1984, Rick Swartz ("Swartz") of the St. Tammany Parish District Attorney's Office (the "District Attorney's Office") produced what he represented to be all of the exculpatory evidence that the Sheriff's Office had turned over to the District Attorney's Office. Later, in April 1994, Swartz gave an affidavit stating that, prior to that *Brady* production, he "made inquiry into the existence of said exculpatory evidence . . . [and] reviewed the investigatory file provided by the St. Tammany Parish Sheriff's Office and inquired of the St. Tammany Parish Sheriff's Office and of the investigators assigned to the case as to the existence of any exculpatory evidence." In the affidavit, Swartz stated that

---

[1]In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the U.S. Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."

8

the October 18 [sic], 1980 statement of Mrs. Frierson to Hale, in which she said that she did not see with whom her son left on the night he was murdered, and Jo Ella Prestwood's April 20, 1981 statement to Hale, in which she said that Pearson admitted to her that he had murdered Frierson, were not part of the investigatory file made available to him by the St. Tammany Parish Sheriff's Office.

Burge's defense attorney at his 1986 murder trial, Wendell Tanner, testified at a 1990 hearing that he had never seen the October 17, 1980 statement of Mrs. Frierson, the April 1981 and November 1983 statements of Prestwood, or Hale's handwritten résumé of his investigation.

In December 1984, the District Attorney reduced the murder charge against Pearson to being an accessory-after-the-fact to the Frierson murder in exchange for Pearson's testimony against Burge. In January 1986, in preparation for Burge's murder trial, the District Attorney's Office discovered that the copy of the Sheriff's investigatory file that had been made from the original investigatory file and delivered to the previous District Attorney in 1980 ("first copy of investigatory file") was missing, and asked the Sheriff's Office for another copy. Captain Debra McCormick ("McCormick"), the chief of records for the St. Tammany Parish Sheriff's Office, testified that because the Sheriff's investigatory file had not been microfilmed by the time of Burge's 1986 trial, she would have made a copy of the file ("second copy of

the investigatory file") from the Sheriff's original.  In April 1986, District Attorney Walter Reed assigned Paul Katz ("Katz") as Special Assistant District Attorney to prosecute Burge.  In a deposition, Katz testified that the second copy of the investigatory file given to the District Attorney's Office by the Sheriff's Office in 1986 did not contain Mrs. Frierson's October 17, 1980 statement and that it included only two of Prestwood's statements.  Katz also testified that he could not recall whether the file contained the detectives' résumés of their investigations.

At Burge's first trial for second degree murder in September 1986, Pearson testified that he witnessed Burge fatally shoot Frierson on October 17, 1980.  Mrs. Frierson, contrary to her original October 17, 1980 statement that was not disclosed or produced for the defense, testified that she saw her son leave her house with Burge and Pearson on the night of the murder.  Mrs. Frierson also testified that she told Hale that on the morning Frierson's body was found, after Burge called Lt. Hermann in their presence, Burge told her and Glenda detailed information about Frierson's death, i.e., that Frierson's body had been found shot four times with a .44 caliber gun under the East Pearl River bridge.  Glenda Frierson Hale, the victim's sister and Hale's wife, testified that Burge had threatened to kill her brother only a few days before the murder, and corroborated Mrs. Frierson's testimony that on the morning after the murder, Burge provided Mrs. Frierson and her with the details of the crime that only a perpetrator would

10

know.

The trial court inspected two statements by Prestwood, and ruled that they were not exculpatory. Prestwood's crucial April 1981 statement that Pearson confessed to being the trigger man was not disclosed and thus was not one of the statements viewed *in camera* by the court. A jury convicted Burge of the second degree murder of Frierson. The court sentenced Burge to life imprisonment at hard labor without parole.

In a February 1995 affidavit, Lt. Hermann stated that a tape recording he had made of a conversation with Burge after the murder, which Lt. Hermann had given to Hale, had disappeared. According to Lt. Hermann, immediately after Burge's conviction, as he and Hale were leaving the courthouse, Lt. Hermann brought up the subject of the missing tape. Lt. Hermann stated that Hale opened the trunk of his car and showed him several "reports and statements" pertaining to the Frierson murder investigation. When Lt. Hermann asked Hale why the documents were in his trunk, Hale allegedly told Lt. Hermann that "[s]ome of this stuff could probably make us lose the case." Lt. Hermann stated in his affidavit that while he did not look at the documents, he was certain that some of the statements were original transcripts because he saw typewriter indentations in the paper.

According to Lt. Hermann, when he asked Hale how he had gotten Glenda Frierson Hale and Mrs. Frierson to lie on the witness stand, Hale told him, "Over a period of time there is a little

11

brainwashing, you tell them the story of what happened, and what you need to win a case in court and they begin to believe it." In his 1995 affidavit, Lt. Hermann also stated that Hale said that he told prosecutor Katz "about the problem with the case, you know about Jean and Glenda testifying and Katz said he would take care of it."

Lt. Hermann testified that he persuaded Hale to turn over to him the documents in Hale's trunk, and that he allowed Burge's attorney to inspect, but not copy, these documents. After reviewing these documents, Burge's attorney filed a Petition For Post-Conviction Relief in state court alleging that the State unconstitutionally deprived the defense of the following exculpatory evidence: (1) the October 17, 1980 statement of Mrs. Frierson in which she said that she did not see who picked up Frierson the night of the murder; (2) Hale's handwritten supplemental report referring to Detective Brooks's statement that Spears told him that Pearson told her that he had murdered Frierson, and Prestwood's statement that Pearson told her he had shot Frierson in the head; (3) Hale's final report referring to the statement of Bernice Frierson that two days before the murder, Pearson had given Frierson, the victim, two days to come up with money that he owed Pearson.

When the court granted a hearing on Burge's motion, the District Attorney's Office discovered that the second copy of the investigatory file was missing, and again asked the Sheriff's

12

Office for another copy. Burge's attorney also had a subpoena duces tecum issued to the Sheriff's Office requesting production of Prestwood's April 20, 1981 statement, any statements by Pearson and Glenda Frierson, and any reports or examinations relating to Burge's automobile. Captain McCormick of the Sheriff's Office testified that she could not recall whether she made copies of the investigatory file for the District Attorney's Office ("third copy of the investigatory file") and Burge's attorney ("fourth copy of the investigatory file") from the Sheriff's original or microfilm files.

At a June 1990 evidentiary hearing on Burge's Petition For Post-Conviction Relief, Wendell Tanner, Burge's original defense attorney, testified that despite his request for *Brady* material in 1986, the District Attorney's Office did not give him Hale's initial résumé of his investigation, Prestwood's April 1981 or November 1983 statements, Mrs. Frierson's October 17, 1980 statement, or an evidence receipt showing that Hale had given investigators an envelope containing paint scrapings from a pillar of the bridge near where Frierson's body was found. The trial court granted Burge's Motion for a New Trial based solely on its finding that Mrs. Frierson's October 17, 1980 statement was exculpatory evidence that constituted *Brady* material that had been withheld from the defense.

### C. Burge's Second Murder Trial and Acquittal

In September 1992, Burge was tried again for the second degree

13

murder of Douglas Frierson.  At the second trial, Mrs. Frierson's testimony in the first trial that Burge had picked up her son that night was impeached by the use of her original statement that she had given to Hale on the day of the murder.  Thereafter, she admitted on the stand that she had lied when she testified under oath at the 1986 murder trial that she saw her son leave with Burge and Pearson on the night he was murdered.  Mrs. Frierson also admitted that she lied at the first trial when she testified that she told Hale that Burge on the morning of Frierson's murder had described to her and Glenda the homicide evidence details after his telephone conversation with Lt. Hermann, although she did not hear him ask for those details.  The defense used Prestwood's statements to impeach Pearson's testimony that he saw Burge shoot Frierson. The jury acquitted Burge of all charges.

## II.  PROCEDURAL HISTORY

In June 1991, Burge filed a civil suit against District Attorney Walter Reed individually, Paul Katz, the St. Tammany Parish District Attorney's Office (collectively the "original DA defendants"); Gary Hale, Sheriff Patrick Canulette individually, and the St. Tammany Parish Sheriff's Office (collectively the "original Sheriff defendants"), for damages for deprivation of his constitutional rights to due process and a fair trial under 42 U.S.C. § 1983 and related statutes by destroying, concealing, or

14

disposing of certain exculpatory evidence.[2]  Burge also alleged a cause of action under § 1983 against the St. Tammany Parish District Attorney's Office and the St. Tammany Parish Sheriff's Office for deficient and substandard policies and practices that allowed the loss of exculpatory evidence in violation of his constitutional rights. Burge alleged no state law claims in the original complaint.

In January 1992, the district court dismissed on the basis of absolute prosecutorial immunity Burge's claim that the original DA defendants directed Hale to "store the investigation file in the trunk of [his] car leading to the disappearance of the exculpatory statements."  The district court did not address Burge's claim that deficient and substandard "policies and training" of the District Attorney's Office allowed the loss and/or destruction of exculpatory statements which resulted in the deprivation of Burge's constitutional rights to due process and a fair trial.

The court also dismissed Burge's claims against Hale individually, and Canulette in his official capacity, on the grounds that the claims had been extinguished by prescription.  The

---

[2] Burge claimed that the defendants failed to produce: (1) statements by Bernice Frierson, Spears, and Pearson; (2) crime lab reports of the tire tracks and red paint scrapings taken at the murder scene that did not match Burge's vehicle; and (3) the detectives' résumés containing information that Pearson had admitted to Prestwood and Spears that he had murdered Frierson and that Mrs. Frierson did not see with whom her son left on the night of his murder.

15

court did not address Burge's claims against Canulette in his individual capacity. On July 8, 1992, the district court entered a judgment in favor of defendants "Parish of St. Tammany, St. Tammany Parish District Attorney's Office, Walter Reed, Paul Katz, Patrick J. Canulette, in his official capacity as Sheriff of St. Tammany Parish, and Gary Hale," dismissing Burge's complaint with prejudice. Burge's appeal challenged only the dismissal of his claims against Canulette in his official capacity and Hale individually on the grounds of prescription. This court reversed that judgment. *See Burge v. Parish of St. Tammany*, 996 F.2d 786 (5th Cir. 1993).

Burge returned to federal court and filed pleadings in the same action re-urging his federal claims against the original DA defendants, adding former St. Tammany Assistant District Attorney Brady Fitzsimmons ("Fitzsimmons") as a defendant, and adding state law claims against all defendants based on malicious prosecution, false imprisonment, infliction of emotional distress, violation of the right to a fair trial under the Louisiana Constitution, and spoliation of evidence.

In March 1994, the district court dismissed Burge's federal claims against the original DA defendants on the basis of res judicata, and dismissed Burge's claims against Fitzsimmons on the basis of absolute prosecutorial immunity. The dismissal order reserved to Burge the right to pursue his state law claims against the original DA defendants and Fitzsimmons.

16

In May 1995, the St. Tammany Parish District Attorney's Office, Reed, Fitzsimmons and Katz (the "DA defendants") moved for summary judgment solely on Burge's pendent state law claims on the grounds that: (1) the "St. Tammany Parish District Attorney's Office" was entitled to dismissal because it was not a legal entity capable of suing and being sued; (2) the remaining DA defendants in their individual capacities were entitled to absolute prosecutorial immunity under state law; (3) the defendants were entitled to discretionary function immunity under La. Rev. Stat. 9:2798.1; and (4) Burge could not prove the essential elements of his state law claims.

In August 1995, the St. Tammany Parish Sheriff's Office, Canulette in his official capacity; Hale, Deputy Freddie Drennan, Deputy Michael Moore and Deputy Clark Thomas, in their individual capacities, (the "Sheriff defendants"), also moved for summary judgment, arguing that: (1) Burge could not meet his burden of proof on the federal claims; (2) the Sheriff defendants were entitled to absolute prosecutorial immunity because Burge accused them of failing to perform functions traditionally reserved for prosecutors; (3) alternatively, the Sheriff defendants were entitled to qualified immunity because they did not violate any clearly established constitutional guarantees; (4) the Sheriff defendants were entitled to discretionary function immunity under La. Rev. Stat. 9:2798.1; and (5) Burge could not prove the essential elements of his state law claims against the Sheriff

17

defendants.[3]

On January 8, 1997, the district court entered its 48-page Order and Reasons. After noting that Burge's federal law claims against the DA defendants already had been dismissed on the basis of prosecutorial immunity, and thereafter on the basis of res judicata, the district court granted the DA defendants' motion for summary judgment on Burge's pendent state law claims on the grounds of absolute prosecutorial immunity. The district court's January 8, 1997 order amended the pleadings *instanter*, joining Reed in his official capacity as a defendant and realleging all claims asserted against the St. Tammany Parish District Attorney's Office as against Reed in his official capacity.

On March 5, 1997, pursuant to Federal Rule of Civil Procedure 54(b), the district court directed the entry of an amended final judgment in favor of Reed, individually and in his official capacity as the District Attorney for St. Tammany Parish, and in favor of Fitzsimmons and Katz individually, dismissing all of Burge's actions against them.

The district court's January 8, 1997 order denied the motions for summary judgment on Burge's state and federal claims filed by

_____

[3] In January 1996, after the defendants' motions for summary judgment were filed, Burge filed a separate diversity suit in federal court against Canulette in his official capacity as Sheriff of St. Tammany Parish, and against McCormick individually, asserting a state law spoliation of evidence claim based on the defendants' alleged negligent or intentional loss or destruction of the original investigatory file. In February 1996, this suit was consolidated with Burge's original federal suit.

18

Canulette in his official capacity, and Hale in his individual capacity, and their insurers. The district court certified the order for appeal under 28 U.S.C. § 1292(b).[4] Canulette in his official capacity, Hale in his individual capacity, and their insurer petitioned this court for permission to appeal the ruling as an interlocutory order. A panel of this court denied the petition as to Canulette and the insurer, but ordered that Hale could take an immediate appeal as of right from the district court's rejection of Hale's claim of prosecutorial and qualified immunity with respect to Burge's federal law claims against Hale in his individual capacity. *Burge v. St. Tammany Parish Sheriff's Office,* No. 97-00044 (5th Cir. Apr. 14, 1997).

Burge appealed from the March 5, 1994 and January 8, 1997 orders dismissing his federal and state law claims against the District Attorney in his official capacity. Burge has stipulated that he has no claims pending against Fitzsimmons, Katz and Reed in their individual capacities. Burge also has conceded that the only issues on appeal with respect to the District Attorney in his official capacity relate to his federal and state law *Monell*-based claims for deliberate indifference to his constitutional rights in the training and supervision of personnel with respect to exculpatory evidence.

---

[4] The district court granted summary judgment for defendants Thomas, Moore and Drennan, in their individual capacities, upholding their claims of qualified immunity. Burge does not appeal this ruling.

19

## III. STANDARD OF REVIEW

A district court's decision to grant or deny summary judgment is reviewed *de novo*, applying the same criteria employed by the trial court in the first instance. *Johnson v. Odom,* 910 F.2d 1273, 1276-77 (5th Cir. 1990), *cert. denied,* 499 U.S. 936 (1991). Summary judgment is proper when the pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, demonstrate that no genuine issue exists as to any material fact and that the movant is entitled to judgment or partial judgment as a matter of law. FED. R. CIV. P. 56(C); *Burns v. Harris County Bail Bond Bd.,* 139 F.3d 513, 517-18 (5th Cir. 1998).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)). If the moving party carries its initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of material fact. "This showing requires more than 'some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584-86 (1986)). While the party opposing the motion may use proof filed by the movant to satisfy its burden, "'only evidence -- not

20

argument, not facts in the complaint -- will satisfy'" the burden. *Id.* (quoting *Solo Serve Corp. v. Westowne Assoc.,* 929 F.2d 160, 164 (5th Cir. 1991)).

This court must "`review the facts drawing all inferences most favorable to the party opposing the motion.'" *Evans v. City of Marlin, Tex.,* 986 F.2d 104, 107 (5th Cir. 1993) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986)). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Johnston,* 14 F.3d at 1060 (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), *overruled in part on other grounds, Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir. 1997) (en banc)).

## IV.   DISCUSSION

We will divide our discussion into two parts, *viz.,* first, the issues related to Burge's claims against the District Attorney and the Sheriff in their official capacities; and, second, the issues related to Burge's actions against the Deputy Hale in his individual capacity. Burge's actions against Reed and Canulette pertinent to these appeals consist only of claims against these officers in their official, rather than their individual, capacities; whereas, Burge's actions against Hale seek to hold him liable in his individual, rather than his official, capacity. Under each part of the discussion we will address separately the issues raised by Burge's claims under 42 U.S.C. § 1983, the state

21

constitution, and state tort law.

### A. Issues Related to Burge's Actions Against the District Attorney and the Sheriff in Their Official Capacities

### 1. Claims Against the District Attorney In His Official Capacity

#### (a) Eleventh Amendment Immunity Is Not Applicable To Claims Against District Attorney in Official Capacity

Although the district court was not presented with, and did not address, the issue of Eleventh Amendment immunity, we raised this issue *sua sponte* at oral argument and the parties were permitted to file supplemental legal authorities with respect to the Eleventh Amendment implications of Burge's claims against Reed in his official capacity as District Attorney for St. Tammany Parish.

"[T]he Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan,* 415 U.S. 651, 678 (1974). *See also McDonald v. Board of Miss. Levee Comm'rs,* 832 F.2d 901, 906 (5th Cir. 1987) ("[E]leventh amendment immunity is a jurisdictional issue that 'cannot be ignored, for a meritorious claim to that immunity deprives the court of subject matter jurisdiction of the action.'"). Under Rule 12(h)(3) of the Federal Rules of Civil Procedure, this court *sua sponte* may raise the issue of its subject matter jurisdiction.

Therefore, we must inquire whether Burge's federal *Monell*

22

claim[5] and his pendent state law claims[6] against Walter Reed in his official capacity as District Attorney of St. Tammany Parish are barred on the ground that Reed enjoys Eleventh Amendment immunity because the District Attorney's Office is an "arm of the state." *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70 (1989).

The question previously has been decided by a panel of this court. The rule in this circuit is that a Louisiana district attorney, sued in his or her official capacity, is a local government official who is not entitled to Eleventh Amendment immunity. *Mairena v. Foti,* 816 F.2d 1061, 1064 n.1 (5th Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988); see also Hudson v. City of New Orleans, No. 96-30964, 1999 WL 249147, at *3 (5th Cir. May 13, 1999) (clarifying why the Eleventh Amendment does not immunize the Orleans Parish District Attorney's Office). It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision. *See Billiot v. Puckett,* 135 F.3d 311, 316 (5th Cir.), *cert. denied,* 119 S. Ct. 413 (1998). We are bound by the decision

---

[5] *Monell* claims are limited to those against local governmental units that are not considered part of the State for Eleventh Amendment purposes. *See Monell,* 436 U.S. at 691 n.54.

[6] "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. . . . [T]his principle applies as well to state law claims brought into federal court under pendent jurisdiction." *Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 121 (1984).

in *Mairena* because it has not been overruled.

Therefore, Burge's federal and state law claims against Walter Reed in his official capacity as District Attorney for St. Tammany Parish are not barred by the Eleventh Amendment.

**(b) The District Court Erred in Dismissing Burge's Official Capacity Suit Against the District Attorney On the Dual Grounds of Absolute Immunity and Res Judicata**

The district court granted summary judgment dismissing Burge's action against the District Attorney in his official capacity based on alleged violations of Burge's federal constitutional rights on dual grounds -- absolute prosecutorial immunity and res judicata.

We conclude that the District Attorney is not entitled to have the official capacity suit dismissed for either of the grounds used by the district court. Instead, the crucial issues appear to be whether the District Attorney failed to establish adequate policies, procedures or regulations to ensure adequate training and supervision of employees with respect to the government's *Brady* responsibility; if so, whether the need to control the agents of the government was so obvious, and the inadequacy of the existing practice so likely to result in the violation of constitutional rights, that the District Attorney can reasonably be said to have been deliberately indifferent to the need; and, if so, whether the District Attorney's deliberate indifference and failure to establish such policies, procedures, or regulations caused Burge's constitutional injury.

24

Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent. *Monell,* 436 U.S. at 691 n.55. Unlike government officials sued in their individual capacities, municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166 (1993). Consequently, the district court erred in granting summary judgment for the District Attorney in his official capacity on the basis of his absolute prosecutorial immunity because that form of personal or individual immunity is not available in an official capacity suit. *See id.*

Further, the District Attorney may not have Burge's suit against him in his official capacity dismissed on the grounds of res judicata. The district court's July 8, 1992 order, upon which the prosecutor relies to invoke the doctrine, cannot be so applied because it was not a final judgment. In that order, based on the court's two prior summary judgment orders, the district court entered judgment in favor of the original DA defendants, Hale individually, and Canulette in his official capacity, dismissing Burge's complaint with prejudice. However, the July 1992 summary judgment order did not adjudicate Burge's action against a co-defendant, Canulette in his individual capacity. Moreover, the January 1992 summary judgment order dismissed Burge's claim in his amended complaint that the original DA defendants directed Hale to

25

store exculpatory evidence in the trunk of his car.  The court failed to adjudicate Burge's *Monell* claim against the Sheriff's Office set forth in Burge's original complaint.

When, as here, the record clearly indicates that the district court failed to adjudicate the rights and liabilities of all parties, an order cannot be presumed to be final irrespective of the district court's intent.  *See Witherspoon v. White,* 111 F.3d 399, 402 (5th Cir. 1997); *Harris v. Rivera Cruz,* 20 F.3d 507, 511-12 (1st Cir. 1994) ("[W]e are reluctant to construe a judgment ambiguous on its face as a final judgment where it could plausibly be read as non-final, where extrinsic evidence does not wholly resolve the uncertainty, and where reading it as final could unfairly forfeit the rights of a party.").

We recognize that a decision that fails to adjudicate all rights and liabilities, while not technically final, can be certified as final pursuant to Rule 54(b):

> When more than one claim for relief is presented in an action, . . . or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

FED. R. CIV. P. 54(b).  Because the district court did not make such a determination and direction designating the July 1992 order as a final judgment, the judgment did "not terminate the action as to any of the claims or parties," but remained "subject to revision at

26

any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties." *See Lauderdale County Sch. Dist. v. Enterprise Consol. Sch. Dist.,* 24 F.3d 671, 680 (5th Cir.), *cert. denied,* 513 U.S. 988 (1994).

Consequently, the district court's July 8, 1992 order was not an appealable final judgment. *See Morrison v. City of Baton Rouge, La.,* 614 F.2d 77, 78 (5th Cir. 1980). Although, in civil cases, a ruling on a motion for partial summary judgment is the law of the case on the issues decided, that ruling is not immutable and has no res judicata effect. *United States v. Horton,* 622 F.2d 144, 148 (5th Cir. 1980) (citing *Travelers Indem. Co. v. Erickson's, Inc.,* 396 F.2d 134 (5th Cir. 1968)); *see also Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415, 1424 (5th Cir. 1995).

Moreover, the January 1992 district court order granting the District Attorney's motion for summary judgment based on absolute immunity, unlike a denial of such a motion, is capable of being fully and effectively reviewed after final judgment; therefore, the *Cohen* collateral judgment doctrine[7] is inapplicable. *See Thompson v. Betts,* 754 F.2d 1243, 1244 (5th Cir. 1985). Hence, the district court's July 8, 1992 order was an interlocutory order, not a final appealable judgment, and cannot be used to invoke the doctrine of res judicata.

### (c) Burge's In Official Capacity Claim Does Not Meet The Requisites Of *Monell* and *Canton*

---

[7] *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541 (1949).

27

Burge appeals from the summary judgment dismissing his suit against the District Attorney in his official capacity and contends that the district court erred because: (1) Burge's suit against the District Attorney in his official capacity for failure to promulgate appropriate policies and procedures for his office is not subject to a defense of absolute immunity; and (2) based on the evidence of record viewed in the light most favorable to Burge, a reasonable trier of the facts could conclude that the District Attorney in his official capacity is liable to Burge in damages under § 1983 for his constitutional injury due to the *Brady* violation caused by the District Attorney's failure to promulgate and implement policies, training and procedures to assure that all evidence favorable to an accused obtained by the Sheriff's Office is conveyed to the District Attorney and disclosed to the defense when the evidence is material either to guilt or to punishment. We agree that the District Attorney may not invoke an absolute prosecutorial immunity privilege in an in official capacity suit for the reasons stated in the foregoing section, but we conclude that the summary judgment must be affirmed because the evidence of record does not reasonably meet the requirements for § 1983 liability under *Monell* and *City of Canton v. Harris*.

In *Monell,* the Supreme Court held that a local government is liable under § 1983 for its policies that cause constitutional torts. *Monell,* 436 U.S. at 694. These policies may be set by the

28

government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Id; see McMillian v. Monroe County, Ala.*, 520 U.S. 781, 784-85 (1997). "A court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *McMillian*, 520 U.S. at 784-85 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

The Supreme Court in *McMillian* explained that:

> a suit against a governmental officer "in his official capacity" is the same as a suit '"against [the] entity of which [the] officer is an agent,'" *Kentucky v. Graham*, 473 U.S. 159, 165[](1985) (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690, n.55[](1978), and that victory in such an "official-capacity" suit "imposes liability on the entity that [the officer] represents," *Brandon v. Holt*, 469 U.S. 464, 471 [](1985).

*McMillian,* 520 U.S. at 785 n.2.

The Supreme Court's cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are policymakers for the local government in a particular area, or on a particular issue, and that our inquiry is dependent on an analysis of state law. *Id.* at 786. *Cf. Jett*, 491 U.S. at 737 ("'[W]hether a particular official has final policymaking authority' is a question of state law[.]'" (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)); *Pembaur*

29

*v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion) (same). "This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *McMillian*, 520 U.S. at 786 (citing *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997) ("[The] federal question can be answered only after considering the provisions of state law that define the agency's character.")).

Although there is no dispute between the parties as to the issues, we conclude that we are required to undertake such an inquiry of our own into: (1) whether the District Attorney is the final official source for policies, training, and procedures to assure that all evidence favorable to an accused obtained by the Sheriff's Office is conveyed to the District Attorney and disclosed to the defense when the evidence is material either to guilt or to punishment; and (2) what entity is liable under § 1983 in an "official capacity" suit for a district attorney's policies that cause constitutional torts related to the failure to disclose material evidence favorable to criminal defendants.

As we noted earlier, for purposes of Eleventh Amendment immunity, a district attorney, sued in his official capacity, is a local, not a state, government official and, therefore, is not

30

entitled to such immunity. *Mairena,* 816 F.2d at 1064, n.1; *Hudson,* 1999 WL 249147, at * 14. Under the Louisiana Constitution and laws, a district attorney, like a sheriff, is virtually an autonomous local government official. LA. CONST. art. 5, §§ 26, 27; art. 6, §§ 5(G), 7(B), 25; La. Rev. Stat. 16:1, *et seq.* Subject to a narrow, rarely invoked exception, the Louisiana Constitution provides that a district attorney has charge of every criminal prosecution by the State in his district, and is the representative of the State before, and legal advisor to, the grand jury. LA. CONST. art. 5, § 26(B); *see State v. Perez*, 464 So. 2d 737, 746 (La. 1985) (Dixon, C.J., concurring in the denial of rehearing); *In re Guste*, 454 So. 2d 806 (La. 1984); Charles J. Yeager & Lee Hargrave, *The Power of the Attorney General to Supercede a District Attorney: Substance, Procedure & Ethics*, 51 LA. L. REV. 733 (1991).

Further, a district attorney is constitutionally authorized to select assistants as authorized by law, and other personnel. LA. CONST. art 5, § 26(A); and is constitutionally shielded from the effect of powers granted other local government entities. LA. CONST. art. 6, §§ 6(G), 7(B), and 25. In addition to the specific grants of constitutional powers and duties, there are statutory provisions for powers and duties; authority to employ assistants, investigators, and other personnel; funding from state, local, and independent sources; and the establishment of a retirement system for district attorneys and their assistants. La. Rev. Stat. §§ 16:1-912; §§ 11:1581-1587. These constitutional and statutory

31

provisions indicate that a district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of his office.

Although we have found no Louisiana cases squarely deciding the issue, we infer from state cases dealing with sheriffs that the entity liable for the torts of a district attorney's employees under state law is the office of the district attorney as an independent local government entity.[8]  In a suit under Louisiana tort law against a sheriff, seeking to hold him vicariously liable for the tort of his employee or deputy, and not because of the

---

[8] In *Diaz v. Allstate Ins. Co.*, 433 So.2d 699 (La. 1983), the Louisiana Supreme Court produced a fractured decision without a majority rationale.  In vacating a district court's declaration of unconstitutionality of a state statute, but affirming the district court's decision overruling the State's motion for summary judgment: two justices were of the opinion that an assistant district attorney was an employee of the State, not of local government, for purposes of seeking indemnification by the State from financial loss arising out of any claim by reason of his employment-related torts under La. Rev. Stat. § 13:5108.2(B) and therefore was entitled to bring the state in as a third party; one justice concurred without reasons; one justice concurred in the result apparently because he agreed with the district court's reasoning that La. Rev. Stat. § 42:1441(A), which purported to shield the State from liability for damage caused by an employee of a district attorney, was unconstitutional; one justice dissented being of the opinion that an assistant district attorney is not a state employee; one justice dissented principally because he did not think the State could be third-partied under a statute that merely facilitates indemnification following a judgment or specially approved settlement: and one justice dissented without contemporaneously filing reasons.  In view of our circuit precedent in *Mairena v. Foti*, 816 F.2d 1061 (5th Cir. 1987), holding that a Louisiana district attorney is a local government official not entitled to Eleventh Amendment immunity, none of the opinions in *Diaz* is helpful in identifying the entity liable under § 1983 in an "official capacity" suit for the constitutional torts caused by a district attorney's policies.

sheriff's own negligence, the sheriff in his official capacity is the appropriate governmental entity on which to place responsibility for the torts of a deputy sheriff. *See Jenkins v. Jefferson Parish Sheriff's Office*, 402 So.2d 699, 671 (La. 1981); *accord Riley v. Evangeline Parish Sheriff's Office*, 637 So.2d 395 (La. 1994). Therefore, a sheriff cannot be held personally liable in vicarious responsibility for the torts of his employee or deputy, and any judgment against a sheriff in his official capacity must be recovered from his liability insurer or the public funds controlled by him or his successor in office. *Id.* Because the district attorney's position is closely analogous to that of the sheriff as a virtually autonomous local government official, we conclude that the Louisiana courts would be guided by the same principles and deem suits seeking to hold a district attorney vicariously liable for the torts of assistants or employees, and not for the district attorney's own negligence, to be in-capacity suits in which the district attorney could not be held personally liable.

Considering the Louisiana constitutional and statutory law and tort cases, we conclude that, in a suit against a district attorney in his official capacity under § 1983 for constitutional torts caused by the district attorney's policies regarding the acquisition, security, and disclosure of *Brady* material, a victory for the plaintiff imposes liability on the district attorney's office as an independent local entity. Accordingly, a district

33

attorney cannot be held personally liable in an "official capacity" suit, and any judgment against a district attorney in his official capacity must be recovered from his liability insurer or the public funds controlled by him or his successor in office.

For purposes of "official capacity" suits under § 1983, the district attorney's office resembles other local government entities. Therefore, we advert to the Supreme Court's development of principles for determining whether a municipality or other local government entity should be held liable under 42 U.S.C. § 1983 for the constitutional tort of its employee. Title 42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Monell,* the Supreme Court held that municipalities and other local government bodies are "persons" within the meaning of § 1983. *Monell,* 436 U.S. at 689. The Court said that municipalities cannot be held liable for constitutional torts under § 1983 "on a *respondeat superior* theory," *id.* at 691, but they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."

34

*Id.* at 694. "[T]ortious conduct, to be the basis for municipal liability under § 1983, must be pursuant to a municipality's 'official policy'. . . . [This] requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479. In other words, "[t]he act of the municipality is the act only of an authorized policymaker or of an employee following the policymaker's lead." *Bryan County Comm'r v. Brown*, 520 U.S. 397 (1997) (Souter, J. dissenting).

The "official policy" requirement may be met in at least three different ways: *Id.* at 406-08. (1) "[W]hen the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Id.* at 417 (Souter, J., dissenting). *See, e.g., Monell,* 436 U.S. at 660-61 (city agencies issued a rule requiring pregnant employees to take unpaid leaves before any medical need arose); (2) Where no "official policy" was announced or promulgated but the action of the policymaker itself violated a constitutional right. *Bryan County,* 520 U.S. at 417-18 (Souter, J., dissenting). *See Owen v. City of Independence*, 445 U.S. 622 (1980) (city council allegedly censured and discharged an employee without a hearing); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (city council canceled a license permitting a

concert following dispute over the content of performance); *Pembaur*, 475 U.S. at 485 (county prosecutor, acting as county's final decision maker, directed county deputies to forcibly enter plaintiff's place of business to serve *capiases* upon third persons); and (3) Even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r]. . . can reasonably be said to have been deliberately indifferent to the need." *Canton,* 489 U.S. at 390 ("Only where a municipality's failure to train its employees . . . evidences a 'deliberate indifference' to the rights of its inhabitants can . . . a shortcoming be . . . city 'policy or custom'. . . actionable under §1983.").

The present case falls in the third category because Burge argues that the District Attorney failed through deliberate indifference to establish policies and procedures needed to protect accuseds from *Brady* violations, not that the District Attorney promulgated a generally applicable policy whose implementation caused a constitutional tort or that, without announcing a policy, the District Attorney violated a person's constitutional right by his own act. Moreover, based on the record presented for our review, there can be little doubt that the District Attorney's policies and procedures on their face did not violate the

36

Constitution. The District Attorney entrusted the prosecution of murder and other major felony cases only to well qualified and experienced assistant district attorneys. The record does not indicate that the District Attorney established a special training or testing program for the assistants with regard to identifying and disclosing exculpatory evidence. Instead, he relied on the professional education, training, experience, and ethics of the assistants in the performance of their constitutional responsibilities. There was no evidence of a single instance, much less a pattern, of *Brady* violations by the District Attorney's Office prior to the Burge case. The District Attorney testified that his specific instruction or policy "across the office" was that any material classified as *Brady* material was to be surrendered to the defense; that any assistant district attorney who withheld *Brady* material contrary to this policy would be subject to disciplinary action or termination; and that there had been no violation by any assistant of which he was aware. The First Assistant District Attorney testified essentially to the same policy and to the absence of any violations. The record contains no evidence controverting their testimony with regard to the office policy and good record prior to the Burge case.

The District Attorney stated that the office procedure for inspecting an investigatory file for *Brady* material was that, first, the Chief of the Criminal Division screened each felony file and made an initial determination; second, the assistant district

37

attorney to whom the case was assigned reviewed the file and conferred with the Chief of the Criminal Division as to the final determination and response to discovery motions; finally, if the case was reassigned, the newly assigned assistant would be thoroughly briefed about the case and the file by the first attorney on the case.

Specifically, the claim in this case is that the District Attorney should be held liable in his official capacity because of his "complete failure to promulgate and implement policies, training and procedures to insure that all pertinent materials, including exculpatory evidence, that are gathered by a Sheriff's Office are transmitted from the Sheriff to the District Attorney [and] then disseminated to the appropriate [assistant district attorneys.]"  Appellant's Orig. Br. at 19.

The Supreme Court has recognized that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983."  *Canton*, 489 U.S. at 387 (citing numerous courts of appeals cases, e.g., *Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983), *cert. denied,* 467 U.S. 1215 (1984)).  For example, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . .  Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its

38

inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 388. If, in the light of the duties assigned to specific officers or employees the need for more or different training is so likely to result in the violation of constitutional rights, the policymakers of a city can reasonably be said to have been deliberately indifferent to the need, for which the city may be held liable if the failure to provide proper training, which may be viewed as a city policy, actually causes injury. *Id.* at 390. The *Canton* Court emphasized that, for liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury. *Id.* at 391. In other words, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform, and it must be proven that the identified deficiency in training actually caused the failure of the employee or officer to perform his duty constitutionally, i.e., that the injury would have been avoided had the employee been trained under a program that was not deficient in the identified respect. *Id.* We see no reason that these principles should not also govern our decision in determining whether the district attorney is liable under § 1983 for failure to establish policies and procedures obviously needed to prevent *Brady* violations.

Applying the foregoing principles, we conclude that there is no warrant in the record for a reasonable trier of fact to find

39

that the District Attorney deliberately disregarded the need for additional policies, training, and procedures to insure the acquisition of *Brady* material from the Sheriff's Office, its secure distribution to the appropriate assistants, and its disclosure to criminal defendants when the evidence was material to guilt or punishment. The summary judgment evidence does not focus directly on the adequacy of the training or supervision of the District Attorney's assistants and employees in relation to the tasks that particular persons must perform. Instead, Burge attempts to identify deficiencies in the District Attorney's Office procedures and record keeping that reflect inadequate supervision or training.

When the District Attorney took office in January 1985, his staff inventoried all of the files on hand and began a system of logging each old and new file on Rolodex files. The office obtained a computer system in 1987 and now keeps track of the files electronically. The District Attorney established a written policy of requiring that all files be kept in a record room and checked out only through a custodian, but this proved to be unworkable due to the assistants' continual need to readily access the files. Hence, assistant district attorneys are allowed to check out files assigned to them to be kept in their offices. The files may not be taken out of the District Attorney's Office or turned over to any person other than an attorney assigned to the case. The District Attorney's Office usually receives a copy of the detectives' complete investigatory file from the Sheriff's Office. The

Sheriff's Office retains the original file and in due course microfilms the entire file and places the original in storage. If the Sheriff's detectives generate additional material for a file of which a copy already has been sent to the District Attorney's Office, a copy of any additional matter is forwarded to the District Attorney. If the Sheriff's and the District Attorney's systems work as designed, until final disposition of a case, there will always be a complete, up-to-date original investigatory file, and in due course a complete microfilm copy, in the Sheriff's Office, as well as a complete updated copy of the original or microfilm copy of the investigatory file in the District Attorney's Office.

The District Attorney and his first assistant testified that very infrequently a page or part of an investigatory file copy has been misplaced by their office, requiring them to obtain backup copies of pages or parts from the Sheriff's Office. They could not recall any specific instance, except in the Burge case, in which an entire investigatory file copy had been lost by their office; they were certain that no other murder or major felony file copy had been misplaced. The District Attorney's Office does not have a microfilm system and relies on the Sheriff's Office as its back-up system. The record contains no evidence that controverts their testimony.

Burge argues that the District Attorney's policies, training, and procedures were constitutionally deficient because he did not

institute any policy or procedure to ensure that the Sheriff's Office would turn over all *Brady* material in each case. The record is devoid of evidence, however, that prior to the Burge case the Sheriff's Office ever failed to deliver complete copies of the investigatory files to the District Attorney or to update them properly. The District Attorney's Office procedures required that in each case, in addition to the review of the investigatory file for *Brady* material by the felony-screening attorney and the attorney assigned to the case, each assistant district attorney was required to conduct pre-trial interviews with the State's witnesses, which usually included investigating officers, thus providing another check against failure to detect and disclose *Brady* material. Burge does not describe in any detail the specific *Brady*-related policy or procedure the District Attorney should have imposed on the Sheriff's Office or point to any clear legal authority for a district attorney's oversight or regulation of a sheriff's operations.[9] Burge's argument that the incumbent

---

[9] It is true, as Burge points out in his opposition to summary judgment, that the Supreme Court in *Kyles v. Whitley*, 514 U.S. 419 (1995), in rejecting the argument that the state prosecutor in a criminal case "should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor[,]" stated:
[N]o one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Since, then, the prosecutor has the means to discharge the government's *Brady*

42

district attorney should have established policies and procedures to bring about greater cooperation in the communication of information by former assistant district attorneys employed by his predecessor in office suffers from similar lack of specificity and citation of legal authority. Burge's assertion that the District Attorney failed to institute a procedure to insure that information of an exculpatory nature was passed on from one assistant to another is simply incorrect, as reflected by our foregoing description of the undisputed evidence regarding the procedures of the District Attorney's Office. Consequently, we conclude that

responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.
*Id.* at 438.

Thus, the Court held that a state prosecutor is responsible, for purposes of the criminal case, for the failure, by any other person acting on the government's behalf in the case, including the police, to disclose known, defendant-favorable evidence rising to a material level of importance. But the Court did not indicate that a state district attorney is vicariously liable under § 1983 for police derelictions or that he or she may use any means other than those available under state law to actually obtain such evidence from the police. The suggestion that "'procedures and regulations can be established'" for this purpose by a prosecutor comes from *Giglio*, which spoke only of a federal prosecutor's authority within his own office to insure communication of promises made to a government witness by one government attorney to every other government lawyer who deals with the case. Under state law, the district attorney has similar authority within his own office, and he has the means to subpoena and depose individual officers and employees of other government officials, but it is doubtful that he enjoys the broad power to promulgate *Brady*-related regulations and procedures governing the internal operations of a sheriff's office.

based on the evidence of record, no reasonable trier of the facts could find a deficiency in the District Attorney's administration of his office, with respect to the training and supervision of his own personnel or the elicitation of full disclosure of *Brady* material from the Sheriff's Office, that reflects deliberate indifference to the constitutional rights of defendants in criminal cases.

Even if we were to assume deliberate indifference by the District Attorney in administration, supervision, and training with respect to *Brady* material, the summary judgment evidence does not support a reasonable finding that such a deficiency actually caused the *Brady* violation of Burge's constitutional rights prior to and during his first trial. The record reflects that there was a failure to disclose several items of evidence favorable to the defense within the knowledge of officers acting on the State's behalf in the case: (1) Mrs. Frierson's October 17, 1980 statement that she could not identify the person with whom Douglas Frierson departed from her house shortly before his murder; (2) Prestwood's statement of April 21, 1981 in which she said Pearson told her that Frierson had been "ratting" on Pearson and Burge and that Pearson "shot his head"; (3) Prestwood's statement of November 23, 1983 in which she admitted that she lied when she told Hale that Pearson had been with her on the night of the murder, and in which she again said that Pearson told her that Frierson was a "rat" and that "we had got his head blown off"; (4) red automobile paint scrapings

44

from the scene of the crime that did not match Burge's vehicle; (5) Detective Hale's case summaries that referred to the above defense-favorable evidence. Because the net effect of the State-suppressed evidence favoring Burge raises a reasonable probability that its disclosure would have produced a different result at the first trial, the failure to disclose that evidence violated Burge's constitutional rights. *See Kyles,* 514 U.S. at 433-34; *United States v. Bagley,* 473 U.S. 667 (1985); *United States v. Agurs,* 427 U.S. 97 (1976).

Under the record evidence, however, the cause of the violation cannot be attributed reasonably to the District Attorney's failure to adequately supervise or train his personnel or to diligently seek *Brady* material from the Sheriff's Office. The undisclosed evidence favorable to the defense was of such a quality and quantity that any reasonably qualified and experienced prosecuting attorney would have recognized it as *Brady* material that he was required to disclose. The assistant district attorneys who reviewed the Burge file possessed credentials even superior to those reasonably required by their positions. Thus, there was no obvious need for more or different training to enable them to recognize the particular undisclosed *Brady* material in this case and know that they were required to disclose it.

The Sheriff's Office personnel testified that, when the District Attorney's Office discovered that their first copy of the Sheriff's investigatory file was missing, a second copy of the

45

entire Sheriff's investigatory file was delivered to the District Attorney prior to the first trial. Two assistant district attorneys, Katz and Pastuszek, testified that Mrs. Frierson's October 17, 1980 statement given to Hale definitely was not in the second copy of the investigatory file that they reviewed prior to the first Burge trial. Katz, the assistant who handled the first trial, also testified that he saw two of Prestwood's statements in the file but did not remember which ones they were. He did not recall seeing any of the other *Brady* material in the file. Thus, there is a genuine dispute as to the contents of the second copy of the Sheriff's investigatory file provided to the District Attorney's Office, but it is not a dispute that can be decided so as to hold the District Attorney liable under § 1983 in his official capacity. If the evident items of *Brady* material were in the second Sheriff's investigatory file reviewed by the assistant district attorneys, and they negligently or intentionally failed to disclose them, the risk of such an occurrence was not so obvious as to indicate a need for more or different training, or so likely to happen and violate constitutional rights, that the District Attorney can reasonably be said to have been deliberately indifferent to the need for additional policies, training or procedures to safeguard constitutional rights. *See Canton,* 489 U.S. at 390. If the items of *Brady* material were not included in the second copy of the investigatory file that the Sheriff's Office provided to the District Attorney, of course, the responsibility

46

for the failure to disclose them cannot be attributed to the District Attorney or his assistants for purposes of § 1983 liability.

### (d) Burge's Action Against the District Attorney In His Official Capacity Based on Alleged State Constitutional Violations

Burge argues that the District Attorney should be held liable in his "official capacity" under the State constitution for the same reasons that he ought to be amenable under 42 U.S.C. § 1983. He concedes that the state courts have not addressed the issue, but he contends that we should predict that they will adopt the United States Supreme Court's principles in *Monell* and its progeny in deciding "official capacity" suits against district attorneys and local governmental entities based on the state constitutional torts of their assistants or employees.

Assuming without deciding that we would agree with Burge's forecast of state jurisprudential developments, we necessarily would come to the same conclusions we did when we applied the federal principles of *Monell* and its progeny directly to the evidence of record in this case. Accordingly, for the same reasons assigned in that regard, we are still persuaded that the District Attorney's motion for summary judgment should be granted.

### 2.  Claims Against the Sheriff in His Official Capacity Based on *Monell* and its progeny

The district court denied Sheriff Canulette's motion for summary judgment on Burge's federal *Monell* claim that Canulette, in

47

his official capacity, was deliberately indifferent to Burge's constitutional rights by failing to institute policies and procedures and train personnel in the transfer of *Brady* material to the district attorney's office.  The sheriff filed a notice of appeal but has failed to  demonstrate that we have jurisdiction of the appeal.  We conclude that we do not and accordingly dismiss the appeal for want of jurisdiction.  The district court's order denying the sheriff's motion for summary judgment on Burge's "official capacity" suit based on Monell (which held that municipalities are liable under § 1983 only for violations of federal law that occur pursuant to official governmental policy or custom) did not qualify as a "collateral order," there is no pendent appellate jurisdiction under which we may consider the appeal, and this court has not permitted the appeal under 28 U.S.C. § 1292(b).

Federal courts of appeals have "jurisdiction of appeals from all final decisions of the district courts," except where direct review may be had in the Supreme Court. 28 U.S.C. § 1291.  "'The collateral order doctrine is best understood not as an exception to the 'final decision' rule laid down by Congress in § 1291, but as a 'practical construction' of it.'"  *Swint v. Chambers County Comm'n*, 514 U.S. 35, 41-42 (1995) (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863 (1994) (quoting *Cohen,* 337 U.S. at 546)).  In *Cohen*, the Supreme Court held that § 1291 permits appeals not only from a final decision by which a district court

48

disassociates itself from a case, but also from a small category of decisions that, although they do not end the litigation, must nonetheless be considered "final." *Swint*, 514 U.S. at 42 (citing *Cohen*, 337 U.S. at 546). "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* (citing *Cohen*, 337 U.S. at 546).

The district court's order denying the Sheriff's motion for summary judgment in the "official capacity" suit does not satisfy *Cohen's* requirement that the decision be effectively unreviewable after final judgment. "When [the Supreme Court] placed within the collateral order doctrine decisions denying pleas of government officials for qualified immunity, [the Court] stressed that an official's qualified immunity is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Swint*, 514 U.S. at 42 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Unlike various government officials, when sued in their personal or individual capacities, municipalities do not enjoy immunity from suit -- either absolute or qualified -- under § 1983. *See Leatherman,* 507 U.S. at 166; *Owen* 445 U.S. at 650. Personal- or individual-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. *Graham*, 473 U.S. at 165. "Official-

49

capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Id.* (quoting *Monell*, 436 U.S. at 690).

Accordingly, the Sheriff's assertion that his office cannot be held liable under § 1983 as interpreted by *Monell* and its progeny, because the evidence does not reasonably support a finding that his policy or custom caused a violation of federal law does not rank as an immunity from suit.  "Instead, the plea ranks as a 'mere defense to liability.'"  *Swint*, 514 U.S. at 42 (quoting *Mitchell*, 472 U.S. at 526).  Because an  erroneous ruling on liability may be reviewed effectively on appeal from final judgment, the order denying the Sheriff's summary judgment motion in this "official capacity" suit was not an appealable collateral order.  *See id.*

Although the district court certified its not otherwise appealable order with respect to its denial of the Sheriff's motion for summary judgment under § 1292(b), a panel of this court denied permission for an appeal to be taken from that particular ruling. In an interlocutory appeal certified by the district court under 28 U.S.C. § 1292(b), we have no jurisdiction to consider an order not otherwise appealable unless the district court states his opinion in writing that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation and this court of appeal permits an appeal from the order.  *See Swint,* 514 U.S. at 46.

50

There is no pendent appellate jurisdiction for us to take up the Sheriff's appeal in the "official capacity" suit. We unquestionably have jurisdiction to review the grant of the District Attorney's motion for summary judgment in his "official capacity" suit because the district court designated it as a final judgment under Rule 54(b). Also, we have jurisdiction over Hale's appeal from the denial of his summary judgment motion asserting qualified immunity to the extent it raises a question of law by virtue a previous panel's permission to appeal that order under § 1292(b). But we do not thereby gain authority to review the denial of the Sheriff's motion for summary judgment in his "official capacity" case. When an order is certified by the trial court, and accepted by the appellate court for immediate review pursuant to § 1292(b), such review is limited to the certified order; issues presented by other, noncertified orders cannot be considered simultaneously. *Swint*, 514 U.S. at 50 (citing *United States v. Stanley*, 483 U.S. 666, 676-77 (1987)). Likewise, when immediate appeal of a particular ruling fits within the *Cohen* collateral order doctrine, the court of appeal does not necessarily have authority to review other trial court orders in the case. "'Rather, such claims are appealable if, and only if, they too fall within *Cohen's* collateral-order exception to the final-judgment rule.'" *Swint*, 514 U.S. at 49 (quoting *Abney v. United States*, 431 U.S. 651, 663 (1977)). Although, the *Swint* Court did not specifically address pendent jurisdiction in connection with orders

51

designated as final under Rule 54(b), it stated in general that:

> The parties are correct that we have not universally required courts of appeals to confine review to the precise decision independently subject to appeal. . . . We need not definitively or preemptively settle here whether or when it may be proper for a court of appeals with jurisdiction over one ruling to review, conjunctively, related rulings that are not themselves independently appealable. The parties do not contend that the District Court's decision to deny the Chambers County Commission's summary judgment motion was inextricably intertwined with that court's decision to deny the individual defendant's qualified immunity motions, or that review of the former decision was necessary to ensure meaningful review of the matter.

Swint, 514 U.S. at 50-51 (internal citations omitted).

The parties in this case have not presented any arguments for the exercise of pendent jurisdiction; nor have they contended that the orders are inextricably intertwined or that conjunctive review is necessary to ensure meaningful review. Hale's qualified immunity, which we discuss in the following section, turns on the resolution of purely factual disputes regarding whether he suppressed evidence and suborned perjury. The Sheriff's official capacity liability turns essentially on the factual question of whether the Sheriff's Office delivered copies of its complete investigatory file to the District Attorney. The District Attorney's lack of official-capacity liability stems from Burge's failure to present evidence supporting a reasonable finding of a deliberate indifference to policies, training, and procedures that caused a constitutional tort. The matters not disposed of involve

52

principally factual disputes that must go to trial, and they present no appellate intertwinement that requires immediate conjunctive review. An erroneous ruling on liability may be reviewed effectively on appeal from final judgment.

Therefore, we dismiss for lack of appellate jurisdiction Canulette's appeal of the district court's denial of summary judgment on Burge's *Monell* claim against Canulette in his official capacity.

### (b) State Law Claims Against Canulette

Because the district court's rulings denying summary judgment to Canulette in his official capacity on Burge's state law claims likewise are not included in this court's § 1292(b) certification, and for the reasons stated in the previous section, we lack appellate jurisdiction to review them.

### B. Issues Related to Burge's Claims Against Deputy Hale in His Individual Capacity

### 1. Absolute Immunity

We agree with the district court that Hale is not entitled to absolute immunity on the grounds that his alleged constitutional violations "place him in a role traditionally occupied by prosecutors." The traditional functions of a prosecutor are to decide which suits to bring and to conduct them in court. *Hart v. O'Brien,* 127 F.3d 424, 440 (5th Cir. 1997), *cert. denied,* 119 S. Ct. 868 (1999). Because Hale's function was to obtain evidence prior to indictment, his role was as an investigator, and not a

53

prosecutor, so that he is not entitled to absolute immunity. *See id; Buckley v. Fitzsimmons,* 509 U.S. 259, 276 (1993) (only when the functions of prosecutors and detectives are the same, is the immunity that protects them also the same).

## 2. Jurisdiction Over Orders Denying Qualified Immunity

Although this issue was not raised by the parties, as a threshold matter, this court must examine the basis of its jurisdiction. *Hart,* 127 F.3d at 435. A court of appeals has jurisdiction of appeals from all final district court decisions. 28 U.S.C. § 1291; *Johnson v. Jones,* 515 U.S. 304, 309 (1995). Generally, an order denying a motion for summary judgment is not an appealable final decision under § 1291. *Francis v. Forest Oil Corp.,* 798 F.2d 147, 149 (5th Cir. 1986). However, to the extent that an order of a district court rejecting a governmental official's qualified immunity defense turns on a question of law, it is a final decision within the meaning of § 1291 under the *Cohen* collateral order doctrine, and therefore is subject to immediate appeal. *Mitchell,* 472 U.S. at 530.

Claims of qualified immunity are analyzed under a two-part framework. *Harper v. Harris County, Tex.,* 21 F.3d 597, 600 (5th Cir. 1994). The court first determines whether the plaintiff has asserted a violation of constitutional right at all. *Id.* This court uses "currently applicable constitutional standards to make this assessment." *Rankin v. Klevenhagen,* 5 F.3d 103, 106 (5th Cir.

54

1993). Then the court assesses whether that right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right. *See Siegert v. Gilley,* 500 U.S. 226, 231-32 (1991).

Orders denying qualified immunity are based on an issue of law when: (1) they decide whether the legal right allegedly violated by the official was clearly established at the time of the challenged action; or (2) in cases in which the district court has denied summary judgment for the official on the ground that even under the defendant's version of the facts, the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took. *Mitchell,* 472 U.S. at 528.

On the other hand, to the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of fact for trial, i.e., that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged, we do not possess jurisdiction under § 1291 to consider the claim and, therefore, may not do so absent some independent jurisdictional base (such as certification under 28 U.S.C. § 1292(b)). *See Johnson,* 515 U.S. at 313.

In sum, we possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed

them.

In its order denying immunity, the district court was detailed and precise in articulating the genuine issues of fact that precluded summary judgment. For the following reasons, we conclude that this court lacks appellate jurisdiction to review the district court's denial of Hale's summary judgment motion seeking qualified immunity from Burge's § 1983 claims.

### 3. Alleged *Brady* Violations

Addressing Burge's claims of *Brady* violations by Hale in failing to disclose exculpatory evidence, the district court declared that "the plaintiff has adduced sufficient evidence to overcome the good faith[10] qualified immunity defense of former deputy Gary Hale." According to the court, this evidence included Hale's alleged statements to Lt. Hermann after Burge's conviction that he had hidden original statements in the trunk of his car, and that disclosure of these statements would probably affect the outcome of the case. The district court concluded that Lt. Hermann's testimony alone was "sufficient to pierce the good faith qualified immunity defense of Hale and to *create a fact issue for trial*, rendering summary judgment inappropriate." (Emphasis added).

On appeal, Hale argues that: (1) Mrs. Frierson's first

---

[10] The "good faith" immunity of public officers from constitutional tort liability is now a misnomer; ever since *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), it is forfeited not by showing that the officer was acting in bad faith but by showing that he was violating a clearly established constitutional principle. *See Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir. 1988).

statement was not exculpatory because it is "facially neutral," and did not become exculpatory until she allegedly gave inconsistent testimony at Burge's first murder trial in 1986, after Hale left the Sheriff's Office; and (2) Burge cannot put forth sufficient evidence to show that exculpatory material was withheld intentionally by Hale.

We disagree that Mrs. Frierson's October 17, 1980 statement did not become *Brady* evidence until it became impeachment evidence after her testimony at trial. *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Court "held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting Bagley, 473 U.S. at 682). "*Bagley* materiality is defined 'in terms of suppressed evidence considered collectively, not item-by-item.'" *Id.* at 436. Accordingly, the definition of *Bagley* materiality in terms of the cumulative effect of suppression leaves the government with a degree of discretion, and it imposes a corresponding burden. *Id.* at 437. In our opinion, Mrs. Frierson's October 17, 1980

57

statement in which she said she could not identify either the person who picked her son up just before his murder or the vehicle the person was driving was "favorable evidence" for the defense although alone it might not have been "material." But, when considered collectively with all of the other suppressed evidence, it was clearly favorable and material. From our review of the evidence of record, we believe it may reasonably be contended that Hale was aware of this long before Mrs. Frierson's testimony at the first trial because there is evidence that he was a party to the other suppressions of evidence and to the suborning of the perjury by Mrs. Frierson that conflicted with the first statement she gave to Hale. Moreover, even if the evidence of Hale's suppression of Mrs. Frierson's statement were to be disregarded, Hale's motion for summary judgment must be evaluated in light of the evidence of his other relevant suppressions of evidence.

In support of his motion for summary judgment Hale does not raise any issues of law but argues that Burge's countervailing evidence is not sufficient to prove that Hale intentionally withheld evidence. In short, the issue presented by Hale's motion for summary judgment and the evidence of record is the existence or non-existence of a triable issue of fact about Hale's intent, which is the kind of factual controversy that is not immediately reviewable. *See Johnson,* 515 U.S. at 316.[11] Therefore, this court

---

[11] We summarily reject Hale's alternative legal argument that the law was not "clearly established" because this court did not extend

58

lacks jurisdiction over Hale's appeal of the court's denial of qualified immunity on Burge's § 1983 *Brady* claim.

### 4. § 1983 Claim of Arrest Without Probable Cause

The district court also denied Hale's motion for summary judgment on Burge's § 1983 claim for Burge's alleged false arrest on October 24, 1980, declaring:

> To establish a constitutional claim for false arrest, the plaintiff must prove that the police officer lacked probable cause to arrest him. . . . The presence or absence of probable cause is a material question of fact in dispute, as Detective Hale knew at the time of the first trial that the one witness who could identify Burge as having been with the victim shortly before his murder could not testify as to that fact the day following the murder. While it is certainly possible, indeed perhaps likely, that the factfinder would conclude that there was sufficient evidence to meet the probable cause standard as to the arrest of Burge, such a determination as a matter of law based upon disputed facts is not appropriate in a summary judgment ruling.

On appeal, in addressing Burge's federal claim based on his alleged false arrest on October 24, 1980, Hale argues that there was sufficient evidence to meet the probable cause standard needed for the arrest of Burge, i.e., that Hale had knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been

---

the *Brady* obligation to police officers until 1988, two years after Burge's first trial, in *Geter v. Fortenberry,* 849 F.2d 1550 (5th Cir. 1988). Twenty-one years before *Geter*, this court declared that suborning perjury and concealing exculpatory evidence by police officers were constitutional violations. *See Luna v. Beto,* 391 F.2d 329, 332 (5th Cir. 1967).

committed by the person to be arrested. *See Dunaway v. New York,* 442 U.S. 200, 208 n.9 (1979); *Greer v. Turner,* 639 F.2d 229, 232 (5th Cir. Unit B Mar. 1981).

Burge and Hale dispute underlying historical facts material to probable cause: (1) whether Burge had contact with Frierson after midnight on the day of the murder; (2) whether Burge gave inconsistent statements to the police; and (3) whether Burge had a motive for killing Frierson.

The summary judgment record contains evidence tending to controvert Hale's version and support Burge's: (1) Hale's initial résumé indicates that Sgt. B. Smith gave Hale a statement before Hale's arrest of Burge on October 24, 1980 placing Frierson in Picayune with three identified men other than Burge at 12:45 a.m. on the night of the murder; (2) Mrs. Frierson's initial statement to Hale the day of the murder stated that she could not identify the person or the vehicle of the person who picked up Frierson at her house prior to the murder; (3) Hale's admissions to Lt. Hermann indicating that he had suborned the perjury of Mrs. Frierson to the effect that she saw Burge pick up her son on the night of his murder, and the perjury of both Mrs. Frierson and Glenda Frierson Hale that Burge described details of the murder scene and trauma to the victim's body on the morning of the murder; (4) Hale's initial résumé did not refer to any such statement by Mrs. Frierson or Glenda Frierson Hale; (5) Mrs. Frierson admitted at the second trial that her testimony at the first trial had been perjurious;

60

and (6) Hale's "loss" of the original tape of one of Burge's statements suggests that Hale's claim that Burge's pre-arrest statements were inconsistent is erroneous or intentionally false and that Hale cannot convincingly demonstrate the alleged inconsistencies.

On the other hand, the summary judgment record contains no evidence showing what information, if any, Hale presented to the magistrate who issued the warrant for Burge's arrest on October 24, 1980, other than Hale's boiler-plate affidavit stating, in pertinent part, that on October 17, 1980, "Gerald Burge did willfully, and maliciously Murder Douglas Frierson On US Hwy 190 outside of Slidell, La."  In his deposition, Hale did not testify as to what information, if any, he presented to the magistrate with his application for the arrest warrant.

Hale argues that, nevertheless, he is entitled to a judgment of qualified immunity as a matter of law because his conduct in applying for the warrant, and arresting Burge, was in fact objectively reasonable, citing *Malley v. Briggs,* 475 U.S. 335 (1986).  However, based on the present disputed state of factual development, it is not now possible to conclude as a matter of law -- considering the conflicting evidence in a light most favorable to Burge -- that Hale acted in an objectively reasonable manner in arresting Burge on October 24, 1980.  *See Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir. 1993).  In such case, this court lacks appellate jurisdiction over an appeal from denial of

61

summary judgment. *See id.* at 435-36; *Mangieri v. Clifton,* 29 F.3d 1012, 1016 (5th Cir. 1994).

### 5. State Law Constitutional and Ordinary Tort Claims

Defendant Hale also appeals the district court's denial of his motion for summary judgment on Burge's state law claims of malicious prosecution, false arrest and imprisonment, and violation of civil rights under the Louisiana Constitution.

### (a) State Constitutional Claim

In examining Burge's claim that Hale violated his civil rights arising under the Louisiana Constitution, the district court found that "[b]ecause there are allegations that . . . Hale was not acting in good faith, but intentionally, in depriving plaintiff of his constitutional rights, qualified immunity for state constitutional violations must be denied."

Whether an order is an appealable "final decision" for purposes of 28 U.S.C. § 1291 is a question of federal, not state, law. *Cantu v. Rocha,* 77 F.3d 795, 803 (5th Cir. 1996). An order denying qualified immunity under state law is immediately appealable as a "final decision," provided that "the state's doctrine of qualified immunity, like the federal doctrine, provides a true immunity from suit and not a simple defense to liability." *Id.* at 803-04. The Louisiana Supreme Court has answered this question affirmatively, declaring that "the same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 require us to

62

recognize a similar immunity for them under any action arising from the state constitution." *Moresi v. Department of Wildlife and Fisheries,* 567 So. 2d 1081, 1093 (La. 1990).

Therefore, we are persuaded that Louisiana law insulates government officials entitled to qualified immunity from liability and the burden of suit, as well as from judgment for damages, so that orders premised on the denial of qualified immunity in actions based on Louisiana constitutional violations are appealable in a federal court action to the same extent as district court orders premised on the denial of federal qualified immunity. See *Cantu,* 77 F.3d at 804.

We then address whether the district court's denial of Hale's motion for summary judgment on Burge's state constitutional claims on the grounds of qualified immunity "turned on an issue of law." *Id.* We conclude that it does not.

On appeal, Hale adopts by reference the same purely factual argument asserted against Burge's federal constitutional claims, i.e., that there is insufficient evidence that Hale intentionally withheld exculpatory material and suborned perjury. For the same reasons given above, we lack jurisdiction over the district court's denial of qualified immunity on Burge's state constitutional claim.

### (b) State Ordinary Tort Law Claims

Whether we can exercise pendent appellate jurisdiction over Burge's ordinary state law tort claims against Hale depends on whether we have jurisdiction over Hale's appeal of the denial of

qualified immunity. *See Swint,* 514 U.S. at 51 (pendent appellate jurisdiction is limited to questions that are "inextricably interwoven" with an issue that is *properly before the appellate court"); see also Shinault v. Cleveland County Bd. of County Comm'rs,* 82 F.3d 367, 370 (10th Cir. 1996), *cert. denied,* 519 U.S. 1078 (1997). Because we conclude that we lack jurisdiction over Hale's interlocutory appeal of the denial of qualified immunity, we cannot exercise pendent appellate jurisdiction to review Hale's state law claims of malicious prosecution, false arrest and false imprisonment. *See Shinault,* 82 F.3d. at 371; *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 701 (10th Cir. 1995) ("given our holding that we lack jurisdiction over Defendants' appeal of the district court's ruling on qualified immunity, no permissible appeal exists upon which to exercise pendent jurisdiction").

Therefore, we dismiss for lack of jurisdiction Hale's appeal of the district court's denial of summary judgment on Burge's § 1983 claims and state law claims.

## V. CONCLUSION

For the reasons assigned, SUMMARY JUDGMENT in favor of District Attorney Walter H. Reed and against Gerald Burge dismissing Burge's suit against the District Attorney, in his official capacity, with prejudice, is AFFIRMED; the APPEALS of Sheriff Patrick J. Canulette, in his official capacity, and Gary Hale are DISMISSED for lack of jurisdiction; and the case is REMANDED to the district court for further proceedings.

64

SUMMARY JUDGMENT AFFIRMED; other APPEALS DISMISSED; REMANDED.

All pending motions are hereby MOOT, in light of the opinion.